In re 550 LES MOUCHES FASHIONS, LTD., Debtor.

John S. PEREIRA, as Trustee in Bankruptcy of 550 Les Mouches Fashions, Ltd., Plaintiff,

v.

Lady HOPE a/k/a Lady Hope Dress Co., Inc., Defendant.

Bankruptcy No. 80 B 11339 (PBA). Adv. No. 80–5402–A.

United States Bankruptcy Court, S.D. New York.

Nov. 10, 1982.

---

Robert P. Herzog, New York City, for Trustee.

Platzer & Fineberg, New York City, for Lady Hope Dress Co., Inc. by Steven Karlin.

## DECISION ON COMPLAINT TO RECOVER PROPERTY

PRUDENCE B. ABRAM, Bankruptcy Judge:

This matter, which came on for trial on September 28, 1982, was commenced by the filing of a complaint by John Pereira as Trustee of 550 Les Mouches Fashions, Ltd. ("Les Mouches") on November 13, 1980. An amended complaint was filed on May 5, 1982. The amended complaint has four

counts all of which are based on the sale by the defendant, Lady Hope a/k/a Lady Hope Dress Co., Inc. ("Lady Hope"), of approximately 2,000 items of women's fall apparel, silks and woolens, to Loehmann's, Inc. for $35,000, after adjustments, in August, 1980. The apparel, which will hereafter be referred to as the Oriental merchandise, was admittedly the property of Les Mouches. The first count alleges a breach of contract with the debtor preventing sale of the goods for a 60-day period, which had not expired at the time of the Loehmann's sale. The second and fourth counts allege that the Loehmann's sale was a fraudulent transfer under either Section 548 of the Bankruptcy Code or the law of New York; and count three alleges that the Loehmann's sale and the receipt of the sale proceeds by Lady Hope constituted a voidable preference.

The answer to the amended complaint is basically a general denial but alleges that the Oriental merchandise was given to Lady Hope in or about February, 1980 as security for a debt owed to Lady Hope by Les Mouches.

STATEMENT OF FACTS

Les Mouches, which was owned by Burton Turk, also known as Bernard Thrice, was engaged in the business of manufacturing and selling better ladies clothing. It maintained production facilities of its own and also utilized outside contractors, of which Lady Hope was one. Mr. Turk spent only minimal time on the operations of Les Mouches, the bulk of his time being spent in the fabric business, in which he has been engaged for a number of years. Mr. Turk's knowledge of the ladies clothing business is limited to that obtained through his fabric business and that acquired during the relatively short period that Les Mouches was in business. The day-to-day operations of Les Mouches were entrusted to Malcolm Starr, an individual with a long involvement in the manufacturing and selling of better ladies clothing, who had been a principal in a predecessor to Les Mouches.

Mr. Starr had designed and arranged for the manufacturing of the Oriental merchandise in Hong Kong, which goods were for Fall 1979 and which had been sold prior to their arrival to better dress stores. However, while the goods were en route to the United States, certain important shipping documents were lost and entry of the goods into the United States was delayed approximately 7 weeks, which resulted in a loss of the anticipated sales and an inability to sell the goods due to the end of the pertinent selling season.

Stephen Kent, the president of Lady Hope, began in December 1979 or January 1980 to press for payment of outstanding bills due his company by Les Mouches. The exact amount of the indebtedness then due Lady Hope is in dispute. In February 1980, Mr. Turk caused the Oriental merchandise, which had been stored on his fabric company's premises to be delivered to the premises of Lady Hope in Kulpmont, Pennsylvania. The deliveries took place on four occasions between February 13 and 25, 1980. According to the receipts twenty-two cartons and sixteen pieces were delivered. At the time the goods were delivered to Lady Hope, Les Mouches was unable to pay its debts in a timely fashion and was, apparently, insolvent in that its assets were less than its liabilities.

Mr. Turk testified that the goods were delivered to Lady Hope for storage, although he also conceded that the goods were given to Lady Hope as a show of good faith. See Tr. pp. 30, 61–62. Mr. Kent testified that the goods were delivered in order to secure the outstanding Les Mouches indebtedness, in light of Les Mouches' desire to obtain additional production from Lady Hope. See, Tr. pp. 102–105. Mr. Kent testified that during February, after the initial delivery he went to Mr. Turk's fabric company premises and told Mr. Turk that not all of the Oriental merchandise had been delivered. Mr. Turk then located additional merchandise, which accounts for the last two deliveries. Although the parties' expression of their intentions in causing the delivery of the Oriental merchandise to Lady Hope are different, there is the common thought that somehow the

goods "stood for" the indebtedness of Les Mouches to Lady Hope.

On April 24, 1980, Les Mouches and Lady Hope entered into a written agreement (Tr.Ex. 5). The April 24 agreement provides, in part, as follows:

Lady Hope Dress Co., Inc. will immediately deliver to 550 Les Mouches Fashions, Ltd., one garment per style of those being held at Lady Hope Dress Co., Inc. These samples are to be delivered immediately to 550 Les Mouches Fashions, Ltd. as designated. The balance of the garments are to be held until June 20th, 1980 for "call in" on a C.O.D. basis at the rate of $13.50 per garment until the total amount owed of $25,742.68, which includes taxes is paid.

The parties agree that 550 Les Mouches Fashions, Ltd. is indebted to Lady Hope Dress Co., Inc. in the sum of $25,742.68, and also that Lady Hope Dress Co., Inc. is holding about $130,000.00 worth of merchandise at its selling price of 550 Les Mouches Fashions, Ltd. In consideration of this agreement, no interest shall accrue on 550 Les Mouches Fashions, Ltd. indebtedness.

Mr. Kent testified that the April 24 agreement was entered into at a time when he intended to buy the Les Mouches premises and/or business and that it expresses an agreement to pay "key" money for the 550 Seventh Avenue premises occupied by Les Mouches.

Mr. Kent asserts that the indebtedness of Les Mouches was not in fact the $25,742.68 stated in the April 24 agreement, but a much higher amount, $42,384.42, and that the difference represents the so-called key money. However, this Court finds the allegation that the indebtedness is greater unsubstantiated. The only proof adduced of a different amount was Respondent's Ex. A, which consisted of four statements, one dated December 13, 1979 in the amount of $9,614.74; one dated December 14, 1979 in the amount of $16,360.72; one dated January 14, 1980 in the amount of $10,937.82; and one dated January 30, 1980 in the amount of $5,471.14, for an aggregate of $42,384.42. Mr. Kent had no ledger or book of account with him at the trial and he testified that statements such as Respondent's Ex. A were simply kept in folders until once every month or two when his accountant came in and entered the statements in his books. Thus, no check on the accuracy of the statements comprising Ex. A exists, nor is there any manner of determining what off-setting entries, such as payments, might have been made. Nor was any evidence adduced that would reflect how subtraction of a negotiated key money sum would result in the figure specified in the April 24 letter agreement which is detailed to the penny. Nothing in the record indicates that Mr. Kent ever repudiated the statement of the amount of the indebtedness in the April 24 letter after any negotiations for the proposed purchase ceased. The amount of the indebtedness as stated in the April 24 agreement is binding on Lady Hope and constitutes an admission by Lady Hope of the amount of the indebtedness.

Notwithstanding the terms of the April 24 agreement, there seems to be no dispute that no samples of the Oriental merchandise were delivered to Mr. Turk until late June. Mr. Turk testified that he made a number of requests for the samples verbally, which allegation is not controverted, and that on May 15, 1980, he sent a letter to Mr. Kent requesting the samples. Mr. Kent denied any recollection of receiving the letter although he admitted that he could have received it. In light of other events, Mr. Kent's receipt or non-receipt is immaterial. The Court finds the latter to be merely indicative of a continuing attempt on the part of Mr. Turk to obtain samples so that he might try to sell the goods for the upcoming fall season. As late as June 20, 1980, Mr. Kent himself acknowledged that no samples had been delivered.

The April 24 agreement also refers to amounts to be paid, totalling $9,765.00, on certain merchandise, the so-called "summer goods", manufactured by Lady Hope. On June 20, 1980, Mr. Kent was paid $3,500 in cash by Mr. Turk and signed a receipt that reads as follows:

"received from Burton Turk $3500 in full payment of all summer goods cut made and trimmed. Will give Burton Turk all fall samples and give 60 days to sell same. /s/ Steven Kent."

Mr. Kent has asserted that he signed the June 20 receipt under duress in that Mr. Turk refused to pay him for the summer goods unless he signed the receipt in the terms dictated. It does appear that the $3,500 payment, which was made in cash, was not, in fact, sufficient to satisfy the summer goods indebtedness, as prior payments totalled only $3,800, but the receipt was given at a time when Mr. Kent had admittedly failed to deliver the selling samples as previously agreed. Mr. Kent voluntarily compromised the amount of the indebtedness and agreed to the additional terms because he desired to obtain the cash payment of $3,500.[1]

Sometime in the spring of 1980 when Les Mouches was essentially out of business, Malcolm Starr left Les Mouches and went to work for Mr. Kent and a company owned by Mr. Kent, called Stephen Kent, Ltd., that was engaged in manufacturing and selling better ladies dresses. Mr. Kent asked Mr. Starr in late June to sell the Oriental merchandise. Mr. Starr contacted a number of persons he thought might be possible buyers but received no offers. His uncontroverted testimony is that it was a poor year to try to sell wools but that silks were selling well. He also testified, and the Court accepts his testimony as collaborating that of Mr. Turk in this regard, that the goods were "classic" styles and that the goods were not high fashion goods. Mr. Starr further testified that the saleability of the Oriental merchandise was more affected by being woolens and by the quantity of goods than by the fact that the goods had been made for the prior fall season. The hems were stated to be approximately two inches too long. He contacted five to ten possible buyers known to purchase similar types of goods and testified that no other offer for the entire lot was received. Mr. Starr offered the goods as one lot, which was a large one, so that the goods would not be "cherry-picked." Mr. Starr conceded that relatively few buyers would be in a position to take the volume of goods involved in one lot.

Mr. Starr sold the Oriental merchandise to Loehmann's pursuant to five invoices dated August 1, 1980. The invoices reflect discounts of 50%, 60%, 70% and 80% of Les Mouches' selling price. Mr. Starr testified that although he could no longer recognize the style numbers that he was sure the greater discounts related to the woolen goods. Loehmann's paid $35,000 by checks dated August 5 and 8, 1980 for the Oriental merchandise, after taking $1,590 in credits for shortages.

From the proceeds of the Loehmann's sale, Lady Hope seeks to be allowed to offset alleged expenses for preparation of the goods for sale totalling $9,000. Mr. Kent testified that the goods were badly wrinkled when unpacked, that the goods were not packed by style, that they needed to be placed on hangers and bagged, that some of the goods were damaged by oil spots and that others were missing self belts. He testified that he had his employees work on putting the goods into saleable condition starting in March 1980. Mr. Kent admitted that a so-called "suzy machine" is used to remove the wrinkles from clothes at the rate of about one garment per minute. However, he was unable to provide any documentation of the number of hours involved or the method of calculation used.

The Court finds Lady Hope's claims for these expenses unsubstantiated by credible evidence. Mr. Turk testified, without contradiction by Mr. Starr, that Mr. Starr had inspected the goods when they arrived and that had they been damaged he was sure that Mr. Starr would have called it to his attention and that a claim would have been made against the manufacturer. This seems highly likely since the lateness of the

---

1. The receipt is valid and effective in accordance with its terms. See *In re Braten Apparel Corp.*, 10 C.B.C. 122, 128 (S.D.N.Y.1976). Mr. Kent's acceptance of the reduced payment was motivated by his own economic incentive.

goods caused the loss of their sale. Thus, if the goods were damaged or defective, the loss could be recouped, at least in part, by a claim against the manufacturer. While the Court is mindful of the fact that at least some minor expense must have been involved in the preparation of the goods for sale, the burden was on Lady Hope to come forward with the documentation and detail, assuming that such expenses were not, as the Court finds, *infra,* excluded by contract.

Lady Hope never rendered an accounting of the Loehmann's sale to Les Mouches. Nor, prior to the sale, did Mr. Kent or anyone else on behalf of Lady Hope advise Mr. Turk that a private sale would take place or was being actively sought. The Court finds that the vague conversations reported by Mr. Kent that he said to Mr. Turk that something would be done with the Oriental merchandise if Mr. Turk did not dispose of it soon is insufficient to overcome the plain language of the June 20 receipt that Mr. Turk would have 60 days (i.e., until August 19) to attempt to effectuate a sale.

As to the Les Mouches efforts to sell the Oriental merchandise, Mr. Turk testified that he, upon finally receiving the samples, did contact various persons to attempt to sell the goods and that while he was still engaged in those efforts he learned through a shipping clerk that Lady Hope had sold the goods to Loehmann's. No firm offer was apparently made nor was there any discussion of possible sales prices and there is nothing in the record on which a finding of value for the goods as of August 1980 can be posited other than Mr. Starr's testimony. The petition under Chapter 7 was filed on August 18, 1980.

### LEGAL ISSUES PRESENTED

Two legal issues present themselves in this case. First, does Lady Hope have a security interest in the Oriental Merchandise? Second, if Lady Hope does have a security interest, is the grant of it voidable or do the circumstances of the sale of the Oriental merchandise to Loehmann's give rise to liability?

As to the first question, resort should be had to the Uniform Commercial Code [2] § 1–201 which states that:

" 'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 1–205 and 2–208). Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts. . . ."

Section 1–205(1) provides that

"a course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be interpreted as establishing a common basis of understanding for interpreting their expressions and other conduct."

■ As an alleged secured transaction in goods, this transaction would be covered by Article 9 of the Uniform Commercial Code. Section 9–203 establishes certain formal requisites for the attachment and enforceability of security interests. The commentary to this section makes it clear that a security agreement may be oral if possession of the collateral is in the secured party: "In addition, the agreement must be in writing unless the collateral is in the possession of the secured party."

■ The testimony respecting the parties' intentions regarding the February delivery of the Oriental merchandise to Lady Hope is disputed. Any implication in the testimony of Mr. Turk that the delivery was for storage only cannot overcome the effect of his testimony that the delivery was also

**2.** Lady Hope has suggested that this case would be governed by the law of Pennsylvania. The Trustee's position is that New York law would apply. By virtue of the New York version of UCC § 9–103(1)(b) governing multistate transactions, the location of the Oriental merchandise in Pennsylvania would mandate application of Pennsylvania law. Neither party has suggested that there are any relevant distinctions between the law of the two states, and the Court has found none. The UCC has become a common law for commercial transactions in the United States by virtue of its adoption by all states but Louisiana.

intended as a show of good faith. Were the oral agreement all there was to this case, the case would turn on credibility. However, on April 24, 1980, a date also outside the 90-day preference period, the parties reduced their agreement to writing and the Court finds that this writing governs and supersedes any oral agreement, although the oral agreement provides a context for the April 24 agreement. The Court rejects Lady Hope's contention that the April 24 agreement does not mean what it says because it was a document evidencing the prospective purchase of the Les Mouches business by Lady Hope which never occurred. No such limitation appears from a reading of the documents. Mr. Turk's testimony revealed no such limitation, and, finally, Mr. Kent failed to produce any writing or other evidence that he considered or evidenced an intention to treat the April 24 agreement as a nullity after the Les Mouches/Lady Hope negotiations terminated.

Looking at the April 24 agreement in light of the dictates of UCC § 9–203, questions can be raised about whether it is a security agreement. For example, the description of the collateral relies on a reference to a listing of January 31, 1980, no copy of which was attached to the agreement and only an incomplete copy of which was produced at trial and that was admitted into evidence only over objection of Lady Hope's counsel. The Court is persuaded, however, that there was no ambiguity in the parties' minds as to what they were describing and that, in fact, no other similar goods were then owned by Les Mouches. The description might not be sufficient if the goods had remained in Les Mouches' possession but they did not so this point may be disposed of.

The more serious problem is the absence of any type of "granting" clause. The security agreement is simply implied by the parties' conduct with reference to the agreement and by their prior conduct and as the only logical answer to the following question: what did the parties intend to happen if Les Mouches failed to pay the $13.50 per item within the 60 days specified in the April 24 agreement and thus failed to eliminate the indebtedness? Certainly the parties cannot have intended that Lady Hope would give up the goods. The only logical answer is that Lady Hope would then be free to sell the goods. And, if Lady Hope sold the goods, the obvious implication is that the proceeds would be applied against the outstanding indebtedness of Les Mouches to Lady Hope.

However inelegant the agreement of the parties was, the Court finds that the parties understood and intended for the goods to "stand for" the indebtedness and thereby created a security interest in favor of Lady Hope which was properly perfected by Lady Hope's taking possession of the goods. See UCC § 9–305. That this seems the proper result is further influenced by the language of UCC § 9–203(1)(a) which suggests that less specificity is required in the agreement where the secured party is in possession of the collateral.

The second question, whether the grant of the security interest is voidable or whether the circumstances give rise to any liability, poses a number of issues. The Court finds that the transfer was not a preference since the original transfer occurred no later than April 24, when the agreement was signed. Since this is more than 90 days prior to the filing of the petition, a prime requirement of § 547(b) of the Bankruptcy Code is not satisfied. Furthermore, since another required element for a finding that a preference has been received is that the creditor receiving the transfer receive more than the creditor would in a Chapter 7 liquidation, it is impossible for a creditor who held specific security at the outset of the 90-day period to receive a preference merely by liquidating the collateral during the 90-day period since in a Chapter 7 case the creditor would be entitled to retain the security to the extent of any indebtedness. *See In re Zuni,* 6 B.R. 449 (Bkrtcy.D.N.Mex.1980); *In re Castillo,* 7 B.R. 135 (Bkrtcy. S.D.N.Y.1980); 4 *Collier on Bankruptcy* ¶ 547.21 (15th ed. 1979). *Cf. In re American Properties, Inc.,*

14 B.R. 637, 643 (Bkrtcy.D.Kan.1981) (transfer to an existing secured creditor in payment of debt is not fraudulent conveyance).

■ The trustee has also challenged the transfer of the Oriental merchandise to Lady Hope and its subsequent sale to Loehmann's as fraudulent conveyances. The granting of the security interest to Lady Hope was for value as the outstanding indebtedness, although antecedent, constituted value within the meaning of Bankruptcy Code § 548(d)(2)(A). The question then arises whether the debtor received "less than a reasonably equivalent value in exchange for the transfer." Bankruptcy Code § 548(a)(2)(A). Another way of phrasing this inquiry is whether the property was received to secure an antecedent debt in an amount not disproportionately small as compared with the value of the property. See, e.g., § 67d(1)(e)(2) of the former Bankruptcy Act. Thus, a fraudulent conveyance would exist here if the value of the Oriental merchandise was "disproportionately large" in relation to the Les Mouches indebtedness, or that the Oriental merchandise was not a "reasonably equivalent value" for the indebtedness.

■ The collateral cost Les Mouches approximately $55,000, and Les Mouches' selling price for these goods would have been approximately $130,000. The indebtedness to Lady Hope was $25,742.68. At the time the Oriental merchandise was delivered to Lady Hope its value was unascertainable due to its then lack of seasonableness. The Court finds that it was not unreasonable to take goods with a cost of slightly more than twice the amount of the indebtedness, since the debtor's cost, not its selling price, is a more reasonable basis on which to rely. While the ultimate sale to Loehmann's should not be utilized to validate the initial transfer, the Court must look at the reasonableness in light of what actually occurred. Further, there was no showing of any lack of good faith in the transfer, such as a specific intent to defeat the rights of another creditor. The Court finds that the transfer was not a fraudulent conveyance under the Bankruptcy Code or New York law. In

*Troll v. Chase National Bank of City of New York,* 257 F.2d 825 (2d Cir.1958), the court held that the debt was not disproportionately small as compared with the value of the collateral where the collateral was worth 43% more than the debt. *See also, Epstein v. Goldstein,* 107 F.2d 755 (2d Cir. 1939) (collateral worth 52% more than debt is not disproportionate to value of debt).

The trustee has relied on *Durrett v. Washington National Ins. Co.,* 621 F.2d 201 (5th Cir.1980), which found a fraudulent conveyance occurred when a mortgagee caused a sale under a deed of trust to occur shortly before a petition was filed and the property was sold at approximately 57% of its appraised value. However, the mortgagee was not a defendant in that case, the only defendant being the purchaser of the property at the sale. This Court will not speculate on what the outcome of an action against Loehmann's might have been; it is sufficient to state that there was absolutely no showing at trial that Lady Hope received any benefit or value from the Loehmann's sale beyond the $35,000. Although not bound by the holding in the *Durrett* case since it is a Fifth Circuit case, the Court finds that it does not mandate a finding of fraudulent conveyance in this case.

The sale to Loehmann's, which is the most troublesome issue in this case, presents two problems: was it made in a commercially reasonable manner so as to avoid liability under UCC § 9–504, and did the sale violate the parties' agreement. The sale was clearly made in violation of the agreement between the parties. Although the original selling period would have ended in late June, Mr. Kent executed an amendment extending the period until August 19. The Court finds that the period was extended by Mr. Kent due to his knowledge that he had failed to perform his part of the original transaction—delivery of the samples and did not do so until after granting the 60-day extension. Obviously Mr. Turk could not seriously attempt to sell the merchandise until in possession of the samples. Notwithstanding the agreement

to give 60 days, and although the samples were delivered, Mr. Kent in late June or early July instructed Mr. Starr to attempt to sell the goods.

In considering whether the sale was made in a commercially reasonable manner as required by UCC § 9–504 the Court is troubled by Mr. Starr's role as purchaser of the goods for Les Mouches and seller of the goods for Lady Hope. However, the only evidence offered that the price received was inappropriate was the suggestion that the goods were being sold in season.[3] The buyer for Loehmann's was a long time friend of Mr. Starr and his father. But speculation about a possible less than arms' length transaction leads nowhere when there is no evidence that any other person made any offer for the goods. Nor was there any evidence offered that such goods would be customarily advertised in some fashion. UCC § 9–504 provides that the goods must be disposed of in a commercially reasonable manner; UCC § 9–507 provides penalties for noncompliance with the rules governing disposition of collateral. The concept of what constitutes a commercially reasonable sale is not defined in the Uniform Commercial Code, and the task has been left to the judiciary to handle on a case by case basis. In ruling on such matters the courts have given considerable latitude to secured creditors not to be second guessed in their sales efforts by disgruntled debtors. In *In re Zsa Zsa Ltd.*, 11 UCC Rep. 1116, 352 F.Supp. 665 (S.D.N.Y.1972), *aff'd without opinion* 475 F.2d 1393 (2d Cir.1973), the court held that the fact that goods which had an estimated retail value of $3.5 million were sold for $300,000 did not in and of itself indicate lack of commercial reasonableness. The court stated that the primary focus was not the proceeds received from the sale, but rather the procedures used; it was not the specific details of the sale in isolation, but rather a totality of the circumstances which was the standard of review. Likewise, in *In re Nellis*, 22 UCC Rep. 1318 (1977), the court held that where the secured party sold the debtor's collateral, allegedly worth

$97,000, for $15,000, this was not itself sufficient to support a finding of commercial unreasonableness. The court looked at such factors as the notice given to potential buyers, the nature of the goods, whether any other offers were made, and whether sale was public or private. After consideration of these factors the court concluded that the sale was conducted in a commercially reasonable manner even though the sale yielded proceeds of only $15,000.

In applying the principles in *In re Zsa Zsa Ltd., supra,* and *In re Nellis, supra,* this Court cannot say that, after considering all relevant factors, the disposition of the collateral was conducted in a commercially unreasonable manner.

The debtor was injured by the violation of the agreement to give a 60-day selling period in one regard—the alleged $9,000 expense to put the goods into saleable form. Lady Hope had no legal right to incur, for the debtor's account, expenses in connection with any sale prior to the end of the 60-day period. Furthermore, the parties in their April 24 agreement rejected the possibility that Lady Hope was entitled to any storage or preparation expenses as they had also done in their earlier oral agreement. UCC § 9–207 expressly recognizes that a limitation to recover expenses can arise by contract. Mr. Kent testified that he started hanging and fixing up the goods not later than March at a time when Mr. Turk stated without contradiction that there was no agreement to pay for storage. Since the April 24 agreement contemplated a buy-out of the goods at $13.50 per item, it would have been reasonable to provide explicitly for the nature of any preparation to be undertaken by Lady Hope and for payment of any preparation expenses, which was not done. Moreover, the Court finds that the expenses, if in fact they were incurred, were unreasonable in amount in relation to the price at which the goods were sold to Loehmann's (i.e., $9,000 expenses to receive $35,000 proceeds or approximately 25% of the selling price).

---

**3.** It is impossible to tally the goods sold to Loehmann's with the January 31, 1980 inventory, and the trustee made no effort to do so. Thus, it is presumed that no slippage occurred.

The Court finds that Lady Hope is entitled to retain $25,742.68 of the monies it received from Loehmann's in payment of the debt of Les Mouches to it and that the difference between $35,000 and $25,742.68, or $9,257.32, must be turned over to the trustee.

Settle judgment accordingly.