**In re WINGSPREAD CORP., et al., Debtors.**

**CAROL RUTH, INC., Plaintiff,**

v.

**WINGSPREAD CORP. and Paul Jones, Defendants.**

**Bankruptcy No. 87B10619–30. Adv. No. 88–5624A.**

United States Bankruptcy Court, S.D. New York.

July 13, 1989.

Carolan, Sullivan & Greeley by Christopher Sullivan, Boston, Mass., for Paul Jones.

Daniel A. Zimmerman, New York City, for Carol Ruth, Inc.

Fried, Frank, Harris, Schriver & Jacobson by Brent Friedman, New York City, for debtor.

## DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT

TINA L. BROZMAN, Bankruptcy Judge.

At issue on this motion for summary judgment are the intent and meaning of a postpetition contract, now alleged to be a financing arrangement, drafted without the participation of the debtor's counsel and never submitted for court approval. This dispute is yet another in the many spawned by the actions of the debtor's former chief executive officer and chairman, Norman Hinerfeld (Hinerfeld).

On April 6, 1987, Wingspread Corporation and 12 of its wholly owned subsidiaries (the Debtors) filed voluntary chapter 11 petitions. After unsuccessful attempts to reorganize, the Debtors determined that it was in their best interests to liquidate their valuable assets. The assets were sold. But because there were insufficient monies to fund a liquidating plan of reorganization, on October 3, 1988 all of these cases were converted to chapter 7. Harold Young was appointed trustee.

Prior to bankruptcy, the Debtors were engaged in manufacturing and marketing of clothing and apparel. One of the products they sold through their Pacer Division was a shoe insert or plaque made of a special material (Pacer). Wingspread owned certain licenses and related molds for the manufacture of Pacer. Wingspread had a lucrative minimum requirements contract with C. & J. Clark America, Inc. (Clark) to supply Clark with all its Pacer needs. Wingspread used a contract molder, Dukon Corporation, to produce Pacer using molds owned by Wingspread. To insure that it had adequate Pacer to meet Clark's requirements, Wingspread ordered large quantities. (During the course of the chapter 11 case, Wingspread sold the licenses, molds and dies necessary for the production of Pacer. The ownership of those licenses, molds and dies is the subject of a separate dispute.) Dukon ran the mold for Pacer only once or twice a year, producing inventory for about six months to a year.

Prior to August 1987, defendant Jones, who had a consulting agreement with the previous owner of the Pacer Division, was employed by Wingspread as a consulting engineer. Jones and Wingspread recognized Wingspread as the successor in interest pursuant to that agreement. The consulting agreement charged Jones with the responsibility for requisitioning inventory from Dukon and recommending inventory levels. He functioned, in essence, as production control manager for Pacer. He had supervision of the manufacturing of the goods, quality control and packaging.

Wingspread's relationship with Dukon was such that Dukon advanced the funds for the purchase of raw materials from DuPont Company (DuPont) and for the labor, utilities and other costs involved in manufacturing Pacer. Dukon then billed Wingspread. By July or August 1987, DuPont refused to extend credit to Dukon, presumably because of Wingspread's bankruptcy. With DuPont refusing credit, Dukon was unable or unwilling to continue manufacturing Pacer under the prior arrangements. Jones proposed to Hinerfeld a solution to the problem. As a result, Wingspread and Jones entered into an agreement on August 10, 1987 and afterwards amended (the Jones Agreement) for the expressed purpose of maintaining and improving Wingspread's ability to give good service to its Pacer customers. Under the Jones Agreement, Wingspread was obligated to advance $20,000 to Jones to

cover part of the cost of bringing the inventory up to the desired minimum level. (Pursuant to the amendment, this amount was to increase $18,000 if the parties continued the agreement through a second mold run.) Jones was obligated to order, pay for and take title to the next mold run and any subsequent mold runs purchased provided that Wingspread agreed to the purchase, in advance and in writing. In the event the entire inventory were to be sold and not replaced by Jones, Wingspread was to receive a credit of $20,000 at the time of final shipment in repayment of its advance.

The specifics of the arrangement were that Wingspread would pay Jones for each shipment to its customers at Dukon's price plus a commission of 3 cents per plaque, due at the time of shipment. Dukon and Jones were obligated to carry insurance for the inventory and take the risk of any gain or loss on Pacer returned by customers. Jones was responsible for any miscellaneous charges properly due from Wingspread, which Wingspread would then reimburse to Jones along with its next remittance. If the reimbursement payments were not made timely, 12% interest was to be charged to Wingspread. Wingspread was to continue to control all customer terms and shipments, unless Wingspread failed to pay Jones upon shipment to a regular approved Wingspread customer. In this event, Wingspread granted Jones the right to ship and invoice the customer provided Wingspread's share of the proceeds was maintained in a separate account and then forwarded to Wingspread.

The parties performed under their agreement. Wingspread advanced the $20,000; Jones ordered and paid for the next mold run; Jones obtained insurance; Jones issued shipping instructions to Dukon; and Wingspread paid Jones his cost plus 3 cents per plaque commission. As a result of this arrangement, Wingspread's books reflected a change in perpetual inventory of Pacer. Through August 1987 Wingspread had a positive balance in the inventory account, but beginning in September 1987, the purchase and sale accounts cancelled each other out and there was no balance in the inventory account (at least through February 1988, the date of the balance sheet).

On April 8, 1988 the Debtors applied for leave to sell substantially all of their remaining assets to Pandora Industries Inc., f/k/a HDZ Corporation, an entity owned in part by Hinerfeld. By amended order dated May 5, 1988, I authorized and approved the sale of assets and assumption of leases. The assets sold were defined to include "[a]ll of the Debtors' inventory, including all finished goods, raw materials, unfinished goods, work-in-progress, samples and yarns ... [a]ll of the Debtors' deposits, prepaid expenses and other assets; ..." The closing of the sale (the Sale) took place on May 13, 1988. Title was taken by Carol Ruth, Inc. (Carol Ruth), another corporation owned in part by Hinerfeld.

On July 21, 1988, Carol Ruth commenced this adversary proceeding against Wingspread and Jones. Carol Ruth contends that as a result of the Sale it is entitled to (i) a declaration that it became owner of Wingspread's Pacer inventory on May 13, 1988, (ii) a turnover of the proceeds of any Pacer inventory that Wingspread sold, (iii) all of Wingspread's rights in and to the Jones Agreement and any claims arising under or related to the agreement and (iv) a judgment for the turnover of any monies received by Wingspread under the Jones Agreement subsequent to May 13, 1988 plus interest. Carol Ruth sought a temporary restraining order and preliminary and permanent injunctions prohibiting Wingspread and Jones from selling or transferring the Pacer inventory or, in the alternative, a direction that all proceeds from such sales be placed in an escrow account.

Although I had granted a limited temporary restraining order, on July 27, 1988, I denied Carol Ruth's application for a preliminary injunction. On August 4, 1988 Jones filed a motion for summary judgment on all four causes of action. I entertained oral argument on September 26, 1988 at which time it first became apparent that Carol Ruth's defense to the motion was based on the theory that Jones has no title to the inventory and accounts receivable but entered into a security agreement

governed by article 9 of the Uniform Commercial Code.[1] Thus, I requested additional briefing on the issue of whether this transaction falls within the ambit of Article 9. Those briefs have been submitted.

Summary judgment should be granted when viewing the record in a light most favorable to the nonmoving party, the moving party has met his burden of proving that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. *Cinema North Corp. v. Plaza at Latham Assoc.*, 867 F.2d 135 (2d Cir.1989) and cases cited. *See also* Fed.R.Civ.P. 56(c). All ambiguities must be resolved and all reasonable inferences must be drawn in favor of the party against whom summary judgment is sought. *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 10–11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *48th Street Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th Street Steakhouse, Inc.)*, 835 F.2d 427, 430 (2d Cir.1987), *cert. denied*, 485 U.S. 1035, 108 S.Ct. 1596, 99 L.Ed.2d 910 (1988). The Second Circuit has "repeatedly noted that 'summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated.'" *Balderman v. U.S. Veterans Admin.*, 870 F.2d 57 (2d Cir.1989) quoting *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460 (2d Cir. 1989) quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

Section 9–102 of the New York Uniform Commercial Code (the Code) sets forth the policy and scope of article 9. It provides in pertinent part that "this article applies (a) to any transaction (regardless of form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper, or accounts; ..."

To determine whether the Jones Agreement is within the scope of Article 9, which applies to intended security interests, one must first look to the definition of a security interest contained in section 1–201(37). So far as pertinent, the definition provides that a security interest "means an interest in personal property or fixtures which secures payment or performance of an obligation." Whether such an obligation existed here is a matter of considerable controversy. The Jones Agreement, no paradigm of clarity, does not explicitly obligate Wingspread to purchase Pacer from Jones although Carol Ruth argues that, as a practical matter, the parties understood that Wingspread's only commercially reasonable alternative was to purchase from Jones. It appears that, at a minimum, Wingspread was obligated to pay Jones for what it ordered so that, arguably, a security interest may have been intended in inventory and/or accounts receivable to secure the payment to Jones for his per plaque cost plus 3 cents and for any so-called Miscellaneous Charges from Dukon attributable to Wingspread. This obligation is evident from paragraphs 5 and 6 of the Jones Agreement which provide:

5. Wingspread will pay Jones for each shipment to customers at Dukon's price plus a commission of 3 cents per plaque. These payments shall be due at time of shipment.

6. Jones will pay Dukon for any Miscellaneous Charges properly due from Wingspread, and invoice them to Wingspread along with the next regular inventory shipment. There will be no interest or commission on Miscellaneous Charges as long as they are paid on time. Late payments will earn interest at 12% per year. Copies of all shipping documents and Miscellaneous Charges will go to Wingspread with the invoices from Jones.

In light of these provisions, Jones' assertion, in paragraph 16 of his affidavit of August 4, 1988, that Wingspread not only had no obligation to order any goods from

---

1. The parties have not briefed the question of whose law applies. Conceivably, the transaction could be governed by the laws of New York, Connecticut, New Hampshire or Maine. All four states have enacted the U.C.C. and identical versions of the applicable sections. It does not appear that the pertinent decisional law of the four states conflicts. Accordingly, for convenience, the citations are to the New York Uniform Commercial Code.

him but did not "have any independent obligation to repay me for any money I spent having Dukon manufacture the goods" seems inaccurate. Because there appears to have been some obligation from Wingspread to Jones which might have been intended to have been secured, it is appropriate to proceed with the analysis of whether an enforceable security interest could have been created.

■ Under Article 9, a security interest is not enforceable against the debtor or third parties unless value has been given, the debtor has rights in the collateral and either the collateral is in the possession of the secured party pursuant to agreement or the debtor has signed a security agreement which contains the requisite terms. *See* section 9–203 of the Code. Under the facts and circumstances as set forth in the papers, one could find that value has been given by Jones in that he paid for the purchase of the Pacer inventory. Because the customers were Wingspread's and Wingspread controlled all customer terms and shipment, it would appear that the Debtor has rights in the accounts receivable. Whether the Debtor had rights in the Pacer inventory is not so clear for the Jones Agreement provides that Jones would pay for and take title to any future mold runs.

Nonetheless, under Fed.R.Civ.P. 56(f), summary judgment "may be inappropriate where the party opposing it shows ... that he cannot at the time present facts essential to justify his opposition." Advisory Committee Note to Fed.R.Civ.P. 56(e) (1963). "The non-moving party must have 'had the opportunity to discover information that is essential to his opposition' to the motion for summary judgment." *Trebor Sportswear Co., Inc. v. The Limited Stores, Inc.*, 865 F.2d 506, 511 (2d Cir.1989) quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 2511 n. 5, 91 L.Ed.2d 202 (1986). Carol Ruth urges that given an opportunity to engage in discovery, it may produce evidence to bear out its position. That Carol Ruth has not yet provided facts sufficient to show that the Debtor had rights in the Pacer inventory does not therefore mandate the granting of partial summary judgment.

■ Where the collateral is in the possession of the secured party, the security agreement may be oral. *See* section 9–203 of the Code; *see also Pereira v. Hope (In re 550 Les Mouches Fashions, Ltd.)*, 24 B.R. 509, 514 (Bankr.S.D.N.Y.1982). Although the Pacer inventory may be said to have been in the possession of Jones, by virtue of Dukon's possession, *see* comment 2 to section 9–305 (collateral may be held by either the secured party or an agent on his behalf, so long as the agent is not the debtor or a person controlled by him), the Debtor's right to ship and invoice the customer clearly was not in Jones' possession for one cannot take physical possession of an account or right. Thus, it must be determined whether the parties entered into an oral security agreement respecting inventory.

Security agreement is defined in section 9–105(1)(*l*) as "an agreement which creates or provides for a security interest." Agreement is defined in section 1–201(3) as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act ..."

On a motion for summary judgment, once the movant has met his burden "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... [he] must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) quoting Fed.R.Cir.P. 56(e) (citations omitted). Hinerfeld's affidavit in opposition to the motion for summary judgment states that Jones proposed to finance the manufacture of Pacer inventory and that it was the Debtor's intent that the Jones Agreement was a method of financing the continued manufacture of Pacer inventory. *See* Affidavit of Norman M. Hinerfeld in Opposition to Defendant Paul Jones' Motion for Summary Judgment at ¶¶ 14 and

18. In addition, he described the circumstances surrounding the execution of the Jones Agreement. Drawing all reasonable inferences in favor of and reading all facts in a light most favorable to Carol Ruth, I am constrained to hold that Carol Ruth has come forward with a material issue of fact as to whether the parties did enter into an oral security agreement for the Pacer inventory.

Section 9–203 of the Code provides that unless the secured party has possession of the collateral, the debtor must have entered into a written security agreement. A security agreement need not be denominated as such and may exist by virtue of various documents, none of which standing alone would satisfy the requirements of section 9–203. *Countrywide Metal Finders, Inc. v. Coffee Cupboard, Inc. (In re Coffee Cupboard, Inc.)*, 33 B.R. 668, 671 (Bankr.E.D.N.Y.1983). Cases which have read several documents together and looked at the surrounding circumstances to find a security agreement require there to be " 'some further documentation corroborative of the debtor's intent to pledge collateral' ... [I]n the absence of a 'security agreement' denominated as such, some language reflecting a desire to *grant* a security interest must be contained within the documents offered to establish a security agreement under U.C.C. § 9–203." *Reiber v. Baker (In re Baker)*, 48 B.R. 932, 936 (Bankr.W.D.N.Y.1985) citing *In re Modafferi*, 45 B.R. 370, 372 (S.D.N.Y.1985) (citations omitted and emphasis in original); *see also Mancini v. Hoffman (In re Mancini Meat & Provision Co., Inc.)*, 23 U.C.C.Rep. Serv. 1037, 1039 (D.Conn.1977) (because there was nothing in any of the documents which indicated that the parties ever intended to enter into a security agreement, the court concluded that no security interest existed); *In re Marta Cooperative, Inc.*, 74 Misc.2d 612, 614, 344 N.Y.S.2d 676, 678 (N.Y.Co.Ct.1973) ("Unless the grant of a security interest is contained in the security agreement, there is no security interest.")

Carol Ruth contends that the Jones Agreement is a security agreement. Other than in paragraph 9 of the Jones Agreement, there is nothing which could be read as granting language. Paragraph 9 provides, "If at any time Wingspread is unable for any reason to pay Jones for an order from a regular approved Wingspread customer, Wingspread grants Jones their right to ship and invoice the customer, so long as Wingspread's share of the proceeds is kept in a separate account, and sent to Wingspread as soon as practicable." This clearly granted Jones certain rights which may have been intended as a security interest in accounts receivable. In short, since discovery has not occurred, Carol Ruth has come forward with enough to defeat the motion for summary judgment with respect to accounts receivable.

Whereas there is no language in this document or in any other provided to the court which would indicate the written grant of a security interest in any of the Pacer inventory, because of the procedural posture of the case and the possibility that an oral security agreement may exist, the motion for summary judgment is premature. If, after the completion of discovery, Jones has grounds for summary judgment, his request may be renewed.

Accordingly, the motion for summary judgment is denied.

IT IS SO ORDERED.