**In re KAPLAN BRESLAW ASH, LLC, Debtor.**

**No. 01–11315 REG.**

United States Bankruptcy Court, S.D. New York.

June 20, 2001.

Morrison Cohen Singer & Weinstein, LLP (by Thomas R. Califano, John P. McNicholas), New York City, for Debtor.

Steven E. Stein (by Steven E. Stein), New York City, for Creditor Avuncular Lenders LLC.

Carolyn S. Schwartz (by Wendy Rosenthal), New York City, for Office of United States Trustee.

## DECISION ON MOTION FOR RELIEF FROM THE STAY

ROBERT E. GERBER, Bankruptcy Judge.

### Introduction

In this case under chapter 11 of the Bankruptcy Code, Avuncular Lenders LLC (the "Mortgageholder") moves for relief from the stay under sections 362(d)(2) and (1) of the Bankruptcy Code to permit the Mortgageholder to complete the foreclosure of a mortgage encumbering the warehouse owned by debtor and debtor-in-possession Kaplan Breslaw Ash, LLC (the "Debtor"). For the reasons that follow, the motion is granted, under each of sections 362(d)(2) and 362(d)(1). The following constitutes the Court's findings of fact and conclusions of law, with respect to its determination.[1]

### Facts

On April 17, 2001, this Court held an initial hearing on the motion. Based upon its concern that there might be material issues of disputed fact, the Court scheduled a continued, evidentiary, hearing for May 8, 2001. However, before that date, the parties chose to forego an evidentiary hearing, and the Court held a further, non-evidentiary, hearing on that day instead. Having considered the extensive papers submitted on the motion,[2] and the oral

---

1. While Bankruptcy Rule 9014 makes Bankruptcy Rule 7052 applicable to contested matters like this one, Fed.R.Civ.P. 52(a), made applicable under Bankruptcy Rule 7052, provides that findings of fact and conclusions of law are unnecessary on most motions, including one of the type at issue here. Nevertheless, given the importance of the matter to the parties, and its material impact on the Debtor, the Court considers it desirable to set the basis for its decision in detail here, albeit by the means of a memorandum of decision, authorized under Fed.R.Civ.P. 52(a).

2. After the Mortgageholder filed its motion for relief from the stay, accompanied with a memorandum of law, the Debtor filed an opposition; the Mortgageholder filed a reply, accompanied by another memorandum of law; the Debtor filed a supplemental opposition; and the Mortgageholder filed a separate reply to the Debtor's supplemental opposition. References to these papers are cited as Mortgageholder's Motion at __; Mortgageholder's Br. # 1 at __; Debtor's Opp. # 1 at __; Mortgageholder's Reply # 1 at __; Mortgageholder's Br. # 2 at __; Debtor's Opp. # 2 at __, and Mortgageholder's Reply # 2 at __. References to the transcripts of the two hearings of April 17 and May 8 are cited as Hrg. # 1 Tr. at __, and Hrg. # 2 Tr. at __, respectively.

argument at the two hearings, the Court finds as facts the following:

The Debtor is a limited liability company, whose members are Marc Breslaw and Jonathan Ash, each of whom holds a 50% interest in the Debtor.[3] Its sole asset is a warehouse (the "Warehouse") located at 536–538 West 50th Street in New York City,[4] which, as described more fully below, the Debtor's principals have attempted to shield from the claims of creditors, both secured and unsecured, for a considerable time.

The Debtor is one of several business entities owned in whole or in part by a group of core people. Another such entity is Kaplan–Breslaw–Ash Inc. (not to be confused with the Debtor, which lacks the hyphens in its name, and which is a limited liability company), which operated a plumbing business at the Warehouse,[5] and was a debtor in a chapter 7 case before another judge of this Court (the "Related Corporation").[6] The Mortgageholder's assertions that (a) the shareholders of the Related Corporation were Marc Breslaw and Jonathan Ash; (b) they were the members of the Debtor; and (c) the Related Corporation and the Debtor were "for all intents and purposes one entity"[7] were

not disputed by the Debtor, and like other unchallenged assertions, described above and below, the Court finds them as facts.[8] Still another such entity is Ash Construction, whose principal is Gordon Ash, the father of Jonathan Ash and the father-in-law of Marc Breslaw.[9]

The Debtor did not challenge the Mortgageholder's assertion that on July 12, 1998, the Related Corporation transferred title to the Warehouse to the Debtor for no consideration.[10] The Debtor similarly did not challenge the Mortgageholder's assertion that title to the Warehouse was transferred by the Related Corporation to the Debtor in order to avoid a situation where the liabilities of the Related Corporation would be reduced to judgment and become liens against the Warehouse.[11] As of an unstated date (but which must have been no earlier than May 11, 2000, as judgments of that date are reflected on a title report showing them), liabilities of the Related Corporation that were ultimately reduced to judgment against the Related Corporation totaled $470,452.[12]

In January 2000, the Debtor's members Mr. Breslaw and Mr. Ash (on behalf of the Related Corporation) and Sterling National Bank ("Sterling") (an affiliate of the

Given the parties' waivers of an evidentiary hearing (*see* Hrg. # 2 Tr. at 27–29), the Court has accepted each of their factual assertions as true, except to the extent disputed in any of the papers; to the (minimal) extent that any such matters were disputed, they have not been relied upon by the Court.

**3.** *See* Statement of Financial Affairs, Docket Entry # 1, Item # 3.

**4.** *See* Debtor's Schedules, Docket Entry # 1, Item # 2.

**5.** Mortgageholder Reply # 1 at ¶ 5.

**6.** The Related Corporation's chapter 7 case, Docket No. 00–41507, was filed on June 12, 2000, and terminated on November 20, 2000. The petition in that case was signed by Marc

Breslaw, one of the members of the Debtor in this case, who likewise signed the petition here, and was filed by the same counsel as the counsel representing the Debtor here. (*See* ECF Docket Entry No. 1 in that case).

**7.** Mortgageholder Reply # 1 at 3.

**8.** *See* Hrg. # 2 Tr. at 27–28.

**9.** *See* Califano Aff. ¶ 3 (Docket Entry # 10); Hrg. # 1 Tr. at 19, 27, 36.

**10.** Mortgageholder Reply # 1 at ¶ 5.

**11.** Mortgageholder Reply # 1 at ¶ 6.

**12.** Mortgageholder Reply # 1 Exh. A. at 1–4.

Mortgageholder), agreed to restructure the Related Corporation's then existing debt to Sterling.[13] On January 14, 2000, the Related Corporation executed a Secured Demand Installment Note (the "Related Corporation Restructuring Note"),[14] in the sum of $1,171,145.56, secured by all of the assets, of whatever type, of the Related Corporation, under a Security Agreement dated January 14, 2000.[15] As consideration for the restructuring of the Related Corporation's debt, and simultaneously with the execution of the Related Corporation Restructuring Note, the Debtor guarantied all of the obligations of the Related Corporation; the guaranty was signed by each of Mr. Breslaw and Mr. Ash.[16] The Debtor had previously guarantied all of the Related Corporation's obligations to Sterling, by a guaranty dated December 28, 1997 (the "1997 Guaranty").[17] Mr. Breslaw and Mr. Ash executed personal guaranties of the obligations of the Debtor under its guaranties.[18]

In addition to restructuring the Related Corporation's debt, Sterling lent $200,000 to the Debtor, which in turn was utilized by the Related Corporation.[19] That indebtedness was evidenced by a Mortgage Note, dated January 14, 2000, in the amount of $200,000 (the "$200,000 Mortgage Note").[20] The Debtor's obligations under (a) the 1997 Guaranty and (b) the $200,000 Mortgage Note, up to the sum of $700,000, were secured by a Subordinate Mortgage, dated January 14, 2000 (the "Second Mortgage").[21]

The Second Mortgage provided, *inter alia,* that it would:

> secure so much of the obligations of Mortgagor [the Debtor] under a certain Guaranty of All Liabilities and Security Agreement (the "Guaranty") executed and delivered by Mortgagor to Mortgagee [the Mortgageholder] on December 28, 1997 and the obligations of Mortgagor under that certain Mortgage Note (the "Note") executed and delivered by Mortgagor to Mortgagee on January 14, 2000, as the same may be amended or modified from time to time, as in the aggregate equal Seven Hundred Thousand Dollars .... [22]

In other words, it expressly secured both new value extended pursuant to the $200,000 Mortgage Note and antecedent debt then outstanding under the 1997 Guaranty.

In October 2000, the Debtor and Sterling had negotiations with each other leading to an arguable understanding that the Debtor asserts constituted a settlement agreement. The substance of the alleged agreement was that the Debtor would sur-

---

**13.** Mortgageholder Reply # 1 ¶ 7.

**14.** Mortgageholder Reply # 1 Exh. B.

**15.** Mortgageholder Reply # 1 Exh. C.

**16.** Mortgageholder Reply # 1 at ¶ 8; *id.* Exh. D.

**17.** Mortgageholder Reply # 1 Exh. E. The Court regards the reference in Mortgageholder Reply # 1 ¶ 8 to a 1987 date for that guaranty as a typographical error.

**18.** Mortgageholder Reply # 1 ¶ 9; *id.* Exh. F. The Mortgageholder has stated, without dispute by the Debtor, that each of Mr. Breslaw and Mr. Ash also filed petitions under chapter 7, and their interests as members of the debtor are now part of their respective estates, and controlled by the chapter 7 trustees who have been appointed in their cases. (*See* Mortgageholder Reply # 2 ¶ 22).

**19.** Mortgageholder Reply # 1 ¶ 10.

**20.** Mortgageholder Reply # 1 ¶ 10; *id.* Exh. G.

**21.** Mortgageholder Reply # 1 ¶ 11; *id.* Exh. H.

**22.** Mortgageholder Reply # 1 Exh. H.

render the deed to the Warehouse to Sterling in exchange for a release of the personal guaranties of the Debtor's principals to Sterling of the loan underlying the Second Mortgage, discussed above, and for Ash to participate in any negotiated reduction of the amount due on the First Mortgage.[23] The document that is asserted to constitute the alleged settlement agreement appears in two variants, each of which is in the form of a facsimile transmittal memo dated October 19, 2000, signed by one Ben Katz of Sterling, addressed to Gordon Ash, and calling for the signature of Gordon Ash on behalf of Marc Breslaw, Jonathan Ash and Stephanie Ash–Breslaw (together, the "October 2000 memos").[24] The two October 2000 memos varied in certain respects from each other.[25] However, each provided, in relevant part:

> Please indicate your approval of the following terms *so that I may seek Sterling management's approval for same.*
>
> . . .
>
> If the foregoing accurately reflects the general parameters of our understanding, please indicate your agreement by signing below. . . .

(Debtor Opp. # 1 Exh. A) (emphasis added). The first of the two memos was not countersigned; the second was countersigned by Jonathan Ash; Marc Breslaw; and Gordon Ash. None was signed by the "Sterling management" whose approval Katz said he would then seek. No evidence was submitted indicating that the "Sterling management's" approval of the letter signed by Messrs. Jonathan Ash, Breslaw, and Gordon Ash was thereafter obtained.[26]

Since, by reason of the legal analysis set forth below, the Court finds that neither of the October 2000 Memos constituted a binding agreement with respect to the terms therein, the Court finds, as a mixed question of fact and law, that the settlement agreement alleged by the Debtor does not exist, or, stated alternatively, no binding agreement of the character alleged by the Debtor was ever entered into.

As set forth in the Debtor's petition, the Warehouse has a value of $1,600,000.[27] The Warehouse is partially vacant and the other portion is occupied by a tenant, Art in Motion, which is said to pay monthly rent to the Debtor. According to the Debtor's petition, the lease expires in March 2004.[28]

The Warehouse is now subject to two mortgages (collectively "the Mortgages") both held by the Mortgageholder:

---

23. Debtor Opp. # 1 at ¶ 12.

24. Debtor Opp. # 1 Exh. A.

25. The Mortgageholder notes the inconsistency, Katz Aff. ¶ 8, and the Court notes that the Debtor does not say which of the two represents the alleged deal. *See* Debtor Opp. # 1 ¶ 12 & Exh. A (referring to single "Settlement Agreement," with the two documents comprising it). Of course, only one of them is signed by anyone on the Debtor side.

26. The Court thus has no occasion to consider whether a breach of the alleged agreement would provide a basis for making one or another of the Debtor's obligations unenforceable.

27. At the May 8 hearing, the Debtor asserted it that it was "unclear" as to whether there was equity in the Warehouse, and made reference to an appraisal that was said to value the Warehouse at $2.3 million. *See* Hrg. # 2 Tr. at 13–14. However, the Debtor failed to submit any evidence to support that claim.

28. Counsel for the Mortgageholder represented that the tenant stipulated with the Debtor to vacate the Warehouse on July 15, 2001 However, this was asserted without any evidentiary support, and has been disregarded by the Court. *See* Hrg. # 1 Tr. at 22.

(1) a first mortgage (the "First Mortgage") in the original principal amount of $1,300,000;[29] and

(2) the Second Mortgage, described above, in the original principal amount of $700,000.[30]

The Debtor defaulted under the First Mortgage in January 2000, at which time the outstanding amount of principal and interest was $1,390,000.[31] The Debtor defaulted under the Second Mortgage in May 2000, at which time the outstanding amount of principal and interest was $860,000. Each of those mortgages was scheduled by the Debtor as a liability in such amount.[32]

On August 8, 2000, prior to the filing of the Debtor's petition for relief under the Bankruptcy Code, a foreclosure action was commenced by WAMCO in the Supreme Court of the State of New York, New York County ("State Court") to foreclose on the First Mortgage.[33] The Debtor defaulted in the foreclosure action. On January 2, 2001, the State Court issued an order appointing a receiver with respect to income from the Warehouse.

One week later, on January 9, 2001, the Debtor filed a chapter 11 petition in the United States Bankruptcy Court for the District of New Jersey.[34] On February 13, 2001, Chief Judge Rosemary Gambardella of that court dismissed the Debtor's chapter 11 case, when, more than a month after that case's filing, the Debtor had failed to file its schedules and statement of financial affairs.[35] This chapter 11 case was there-

---

**29.** Apparently, the First Mortgage, and its associated promissory note, was originally held by Hampstead Financial Corporation, came into the possession of WAMCO XXV, Ltd., ("WAMCO"), and was assigned by WAMCO to the Mortgageholder on October 27, 2000.

**30.** The Second Mortgage, which was originally held by Sterling, as noted above, was thereafter assigned to the Mortgageholder (which is an affiliate of Sterling) on February 27, 2001.

**31.** Mortgageholder's Motion at 2.

**32.** *Id.*

**33.** Although an action was not commenced to foreclose on the Second Mortgage, the Mortgageholder stated that it intends to sell the Warehouse and apply the proceeds to both the First Mortgage and the Second Mortgage. *See* Hrg. # 1 Tr. at 25–26.

**34.** Case number 01–30265.

**35.** *See* Mortgageholder's Motion Exh. E. According to the Debtor, its case was originally filed in the District of New Jersey because the Debtor's books and records were located in New Jersey. The Debtor states that it prepared a motion to transfer venue of its case to this Court (for the reason that the Debtor had located a buyer for the Warehouse in New York, and that it would be more convenient to have a sale and hearing of the Warehouse in New York), and that prior to the filing of such a motion, the Debtor's bankruptcy case was dismissed by the New Jersey bankruptcy court without prior notice to the Debtor's counsel. *See* Debtor's Opp. # 1 at 2 n. 1. The Court accepts as true the Debtor's statements as to its intention to transfer its case from New Jersey to this Court (and the Debtor's implicit point that this intention became moot upon the dismissal of the New Jersey case), though the Court notes the striking failure to make any showing in this Court of the alleged buyer for the property.

The Court considers it inappropriate to apply "repeat filer" doctrine, relied on in part by the Mortgageholder, to penalize the Debtor for its filing in New York after the New Jersey filing; the New Jersey chapter 11 case was not dismissed for failure to comply with an order of the court, by motion of the debtor after a creditor motion for relief from the stay, or on the merits, after a determination by that court that the Debtor could not reorganize. However, the Court considers it fully appropriate to consider (and does consider) the New Jersey filing in the context of its timing relative to the Mortgageholder's efforts to proceed with its state court foreclosure proceedings. It also considers it appropriate to note the conspicuous absence of the previ-

after filed in the Southern District of New York, on March 12, 2001.

The indebtedness secured by the First Mortgage and the Second Mortgage totals $2,250,000—an amount substantially in excess of the $1,600,000 value of the Warehouse. The Debtor has not argued, nor submitted any proof, that either mortgage was not duly recorded, or that the Mortgageholder's security interests were not duly perfected. Accordingly, unless the Mortgageholder's security interest with respect to at least one of the mortgages is unenforceable for some other reason, or the note secured by at least one of the mortgages is unenforceable, the Mortgageholder is substantially undersecured, and the Debtor has no equity in the Warehouse.

The only unsecured creditors that the Debtor listed in its schedule of liabilities were:

(1) Sterling, presumably in its capacity of second lien lender (rather than as the holder of the Debtor's guaranty of the Related Corporation's debt), with a gross claim of $700,000, and an unsecured claim in the amount of $400,000 (presumably because $300,000 of the Warehouse's $1,600,000 total value would remain after subtracting the $1,300,000 in first lien debt); [36]

(2) Ash Construction, an affiliate of the Debtor, with a mechanics lien in the gross amount of $260,000, and an unsecured claim in a like amount (presumably because there is insufficient equity in the Warehouse to warrant deeming it secured); [37]

(3) the New York City Department of Finance, with an unsecured, but priority, claim in the amount of $16,000 for real estate taxes; and

(4) the New York City Department of Environmental Protection (scheduled as "NYC DEP"), with an unsecured, but priority, claim in the amount of $3,000 for water and sewer charges.

There is also an unscheduled unsecured claim, evidenced by a proof of claim, filed by Sterling on May 7, 2001 (just before Hearing # 2), based on the Debtor's guaranty of the Related Corporation's debt, in the stated amount of $802,708.18,[38] though the Court believes that it likely overlaps, in substantial part, with the Mortgageholder's deficiency claim, and may overlap with debt that might be secured by the Second Mortgage.

There are no vendors, tort litigants, or unsecured creditors of any other kind scheduled; the Court finds, accordingly, that there are very few unsecured creditors, particularly any whose interests would be served by a chapter 11 reorganization. The Debtor has no income and no expenses. Though the Art in Motion lease may still be alive, and presumably would result in at least some income to the Debt-

ously mentioned proposal to sell the Warehouse, to one who would need to satisfy the debt secured by it, in contrast to the new value plan discussed below.

36. This debt, like the first lien debt, is scheduled as "disputed." *See* Petition Schedule D.

37. As noted above, Ash Construction is an entity whose principal is Gordon Ash, the father of Jonathan Ash and the father-in-law of Marc Breslaw. *See* Hrg. # 1 Tr. at 19, 27, 36. While the Mortgageholder claims this lien is invalid because it was filed in excess of

eight months after Ash Construction allegedly performed capital improvements to the Warehouse and after an action to foreclose the First Mortgage was commenced, *see id.* at 19 (and impliedly, that this evidences self-dealing inconsistent with bona fide efforts to reorganize), the Court need not, and does not, determine whether either of those contentions is the case, as determination of the Mortgageholder's motion can be made on other grounds.

38. Mortgageholder Reply # 2 Exh. A.

or, the Debtor stated in its Rule 1007–2 Affidavit that it would have no income or expenses in the 30 days following the filing. *Id.* at ¶ 12.

Since the Filing Date, the Debtor has not made any payments for adequate protection to the Mortgageholder. Nor have adequate protection payments been tendered.[39] The Debtor has not currently paid, nor indicated its intention currently to pay, post-petition taxes.

Since, by reason of the legal analysis set forth below, the Court finds no basis for determining that either the First Mortgage, or the Second Mortgage, is unenforceable, the Court finds as facts, or as mixed questions of fact and law, that the Mortgageholder is undersecured, and that the Debtor has no equity in the Warehouse.

The Court further finds as facts, or mixed questions of fact and law, that the Debtor incurred $200,000 in debt secured by the Second Mortgage to benefit an affiliate, i.e., the Related Corporation, but that, unlike a corporate parent's borrowing for the benefit of its subsidiary, such borrowing did not confer a benefit on the creditors of the Debtor.[40] However, the Court finds as a fact, or a mixed question of fact and law, that the Second Mortgage was given with respect to an antecedent debt—i.e., the 1997 Guaranty—and thus was not a fraudulent conveyance.

As reported in a Supplemental Opposition filed by the Debtor on May 4, 2001,[41] shortly before Hearing # 2, the Debtor was approached by one Andrew Impagliazzo ("Mr. Impagliazzo") and his counsel with respect to the Warehouse and the possibility of funding a plan of reorganization for the Debtor.[42] The Debtor and Mr. Impagliazzo entered into a Memorandum of Understanding, pursuant to which Mr. Impagliazzo would fund the Debtor's plan of reorganization in exchange for a 95% interest in the LLC. Although "[s]pecific terms of the Plan [were] subject to appropriate documentation and negotiations" between the Debtor and Mr. Impagliazzo,[43] they would include, in material part:

---

39. *See* Hrg. # 1 Tr. at 13; Hrg. # 2 Tr. at 23–24.

40. Rather, incurring such debt on the part of the Debtor conferred a benefit on the Debtor's principals—who used both the Debtor and the Related Corporation, for all practical purposes, as a unitary entity, and without regard to the protection of creditors of either entity, especially the Related Corporation.

By way of example, the Debtor and/or its principals benefited, and creditors of the Related Corporation were correspondingly prejudiced, by the conveyance of the Warehouse from the Related Corporation to the Debtor (which the Debtor's principals likewise owned) without consideration (at a time when the Related Corporation had numerous unsatisfied claims, many of which had been reduced to judgments), to the extent of any value in the Warehouse in excess of the secured debt to which the Warehouse was then subject. The Debtor has not challenged the Mortgageholder's assertion that the Debtor came into ownership of the Warehouse by reason of a motivation to avoid a situation where the liabilities of the Related Corporation would be reduced to judgment and become liens against the Warehouse—in essence, to hinder, delay or defraud the creditors of the Related Corporation. If the Related Corporation was insolvent and there was any equity in the Warehouse at the time of its conveyance to the Debtor (matters as to which the Court does not make factual findings), it would follow that the Debtor itself came into ownership of the Warehouse as a result of a fraudulent conveyance, and that when the Debtor seeks to disclaim obligations to the Mortgageholder now by reason of allegations of fraudulent conveyance, the Debtor is more than a little bit hypocritical, to say the least.

41. As before, the Court accepts these uncontested statements as true.

42. Debtor Opp. # 2 ¶ 8.

43. Debtor Opp. # 2 ¶ 11.

(a) On the effective date of the Plan, or a time thereafter,[44] payment by Mr. Impagliazzo of (i) pre-and postpetition arrearages on the First Mortgage and Second Mortgage; (ii) all outstanding real property taxes and water and sewer charges; and (iii) any amounts would be due to Mortgageholder under section 1124(2)(C) of the Bankruptcy Code;[45]

(b) Mr. Impagliazzo would become a 95% member of the Debtor LLC; and

(c) The Debtor would "simultaneously affirm" the First and Second Mortgages according to their original terms, but would reserve the right to object to the extent and validity of the First and Second Mortgage.[46]

Though not mentioned in the Debtor's Supplemental Opposition, the proposed plan contemplated, and indeed was subject to, Mr. Impagliazzo obtaining financing with respect to the commitments he would undertake. The Memorandum of Understanding provided that it was "subject to . . . the obtaining by [Mr. Impagliazzo] of the appropriate financial commitments from a lender acceptable to the Debtor."

With respect to the necessary financing commitment, the Debtor submitted a letter from an officer at Richmond County Savings Bank to Mr. Impagliazzo, providing, in material part:

> Pursuant to our conversation, based on your substantial financial capacity and our excellent overall relationship, I will be more than happy to consider a commercial mortgage request on the above referenced property [the Warehouse].

(Debtor Opp. # 2 Exh. B). The bank officer's statement that he would "be more than happy" to "consider" a mortgage request does not constitute a commitment to provide the financing that is a condition to the Memorandum of Understanding, or, indeed, any commitment of any kind.

The proposed plan was silent with respect to a number of critical issues with respect to the ability to confirm a plan of reorganization in this case, including:

(a) the treatment of the class of non-priority unsecured claims (which would include the Mortgageholder's deficiency claim, of approximately $650,000);[47]

---

44. How much of a time thereafter was not set forth.

45. This, coupled with the cure of arrearages; the reinstatement of the maturity of the obligation, and not otherwise altering the legal, equitable, or contractual rights of a the holder of a claim, would be a requirement for declaring a class of creditors unimpaired, and thus denying it a vote on the plan. This additional requirement calls for compensation to the holder of such claim for any damages incurred as a result of any reasonable reliance by the claimant on a provision of a contract or applicable law entitling it to receive accelerated payment after the occurrence of a default.

46. Debtor Opp. # 2 ¶ 11; *id.* Exh. A. In the alternative, on the Plan's effective date (or, once more, at an unstated date thereafter), Impagliazzo would pay to the Mortgageholder all outstanding principal and interest due under the First and Second Mortgages; would pay all outstanding real property taxes and water and sewer charges in connection with the warehouse; and would become a member of the LLC.

47. In its final submission, the Mortgageholder has submitted the affidavit of Benjamin Katz, a vice-president of Sterling, with a related proof of claim filed by Sterling seeking recovery of $802,708 as an unsecured claim, with respect to the Debtor's guaranties of indebtedness of the Related Corporation. (Mortgageholder Reply # 2 Exh. A, and Exh. A thereto). While the Court believes that it is highly likely, if not certain, that this claim overlaps in substantial part with indebtedness secured under the Second Mortgage, and the Court does not necessarily take at face value Sterling's statements as to its intentions with respect to how it would vote on a reorganization plan before any plan is proposed and a disclosure statement has been approved by

(b) the Bankruptcy Code's requirements for obtaining the acceptance of one impaired class;

(c) the Bankruptcy Code's "Absolute Priority Rule," which is applicable when a junior class (like equity here) would keep an interest when all senior creditors have not been paid; and

(d) the applicability of principles announced by the United States Supreme Court in *Bank of America Nat'l Trust and Sav. Ass'n v. 203 North LaSalle St. Partnership,* 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999), which had held that a debtor's prebankruptcy equity holders could not, over the objection of senior class of impaired creditors, contribute new capital and receive ownership interests in a reorganized entity without allowing others to compete for that equity or to propose a competing reorganization plan.

With no income coming into the estate, and property of a value so much less than the existing debt (and the unsecured claims, including deficiency claims, that would have to be satisfied apart from the secured debt), the Court cannot find that there is a reasonable possibility for a successful reorganization within a reasonable time. Rather, it finds to the contrary.

Based on the totality of the circumstances, as described and documented above, the Court makes the following additional findings of fact:

(1) This case is for all practical purposes a two-party dispute between the Debtor and the Mortgageholder;

(2) This case was filed as a tactical step in connection with the Debtor's battles with the Mortgageholder, to sidestep the Debtor's obligations for money that was actually borrowed, and used by the Debtor in the manner that the Debtor had intended;

(3) This case was filed for the predominant purpose, if not the sole purpose, of blocking measures by the Mortgageholder to foreclose on the Warehouse, and in particular to utilize the automatic stay provided by section 362 of the Bankruptcy Code with respect to the Warehouse to block Mortgageholder remedies;[48]

(4) The Debtor sought to exploit section 362's automatic stay not for a temporary "breathing spell," but, rather, as a means to maintain ownership of the Warehouse without satisfying the debt associated with it, and to effect delay, and, if possible, a total blockage, of Mortgageholder remedies;

(5) The timing of the Debtor's filings evidences an intent to hinder, delay and/or frustrate the legitimate efforts of the Mortgageholder to enforce its rights; and

(6) Unsecured creditors would not benefit in any material way as a consequence of the filing, or be prejudiced, in

the Court, the proof of claim underscores how the needs and concerns of the class of unsecured claims must be addressed, and how no showing has been made how the Debtor could secure the approval of an unimpaired class.

**48.** Though Rule 1007–2(a)(1) of the Local Rules of this Court requires that the Debtor disclose, in the affidavit that is to be filed under Rule 1007–2, "the nature of the debtor's business and a concise statement of the

circumstances leading to the debtor's filing under chapter 11," the Debtor failed to include that required disclosure. *See* Rule 1007–2 Affidavit of Marc Breslaw, Docket Entry # 1, Item # 6. Particularly under those circumstances, where the Debtor had both the opportunity, and duty, to show a different purpose if it could, the Court believes that based on the surrounding facts and circumstances, it has ample basis to draw this inference.

any material way, by relief from the stay.

### Conclusions of Law

Bankruptcy Code section 362(d), addressing relief from the automatic stay, provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under section (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if-

(A) the debtor does not have equity in such property; and

(B) such property is not necessary to an effective reorganization; or

(3) with respect to a stay of an act against single asset real estate[49] under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90–day period)-

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien), which payments are in an amount equal to interest at a current fair market rate on the value of the creditor's interest in the real estate.

11 U.S.C. § 362(d).

The Mortgageholder has moved under subsections (1) and (2). Subsection (3) also has the potential to be applicable, as the Warehouse is single asset real estate within the meaning of Bankruptcy Code section 101(51B),[50] but (possibly because it moved prior to the 90–day mark in this case) the Mortgageholder has not sought relief under this subsection.

▮▮▮▮ Sections 362(d)(1) and 362(d)(2) are disjunctive; the Court must lift the stay if the movant prevails under either of the two grounds. *See In re Elmira Litho, Inc.*, 174 B.R. 892, 900 (Bkrtcy.S.D.N.Y. 1994) (Bernstein, C.J.). The decision of whether to lift the stay is committed to the discretion of the bankruptcy judge. *Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.)*, 907 F.2d 1280, 1286 (2d Cir.1990). The burden of proof on a motion, like this one, to lift the automatic stay is a shifting one; section 362(d)(1) requires an initial showing of cause by the movant, while section 362(g) places the burden of proof

---

**49.** Single asset real estate, also known as "SARE", is defined in section 101(51B):

"[S]ingle asset real estate" means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor and on which no substantial business is being conducted by a debtor other than the business of operating the

real property and activities incidental thereto having aggregate noncontingent, liquidated secured debts in an amount no more than $4,000,000.

11 U.S.C. § 101(51B).

**50.** That the Warehouse is SARE is undisputed. *See* April 17 Hrg. Tr. at. 10–11; May 8 Hrg. Tr. at 24–25.

on the debtor for all issues other than the debtor's equity in property. *Id.* at 1285.[51]

Thus, with respect to the two statutory grounds relied on by the Mortgageholder, the Mortgageholder must make an initial showing of cause, and has the burden of proof on the issue of the Debtor's equity in the Warehouse, and the Debtor has the burden on all other issues.

*Section 362(d)(2)*

The first of the statutory bases upon which the Mortgageholder relies is Code section 362(d)(2). The Mortgageholder argues that (1) its secured claims exceed the value of the Warehouse; (2) a plan of reorganization cannot be filed within a reasonable amount of time (as the Mortgageholder will not vote to confirm a plan unless it receives the total amount of its claims, which would require that the Warehouse be sold for $650,000 above its value as set forth in the petition); (3) the Debtor is not a going concern, as set forth in the Debtor's 1007-2 affidavit, and there is no cash flow to fund a plan of reorganization; and (4) a liquidating plan of reorganization would not provide any benefit to creditors, as all proceeds would simply go to the Mortgageholder.

The Debtor originally had two, and now has three, contentions to the contrary. As amended by its supplemental opposition, filed on May 4, shortly before Hearing # 2, the Debtor responds (1) that the First Mortgage was purchased by the Mortgageholder in bad faith and in violation of a settlement agreement;[52] (2) that the

giving of the Second Mortgage to Sterling by the Debtor was a fraudulent conveyance that may be recovered by the Debtor for the benefit of the unsecured creditors;[53] and (3) that by reason of the approach of an individual with an interest in the Warehouse and the "possibility of funding a plan of reorganization for the Debtor," the Debtor "has the basis to propose a feasible plan of reorganization."[54]

### 1. Equity in the Property?

The starting point for the analysis under section 362(d)(2) is straightforward, and not a matter of any dispute. A secured creditor seeking relief from the stay under section 362(d)(2) must show (1) the amount of its claim; (2) that its claim is secured by a valid, perfected lien in property of the estate; and (3) that the debtor lacks equity in the property. *Elmira Litho*, 174 B.R. at 900. Under section 362(d)(2), "equity" means the difference between the value of the property and the total amount of claims that it secures. *Id.* at 901 (citing *In re Diplomat Electronics*, 82 B.R. 688, 692 (Bkrtcy.S.D.N.Y.1988) (Brozman, C.J.)). The party requesting relief from the stay has the burden of proof on the issue of the debtor's equity in the Property and the party opposing such relief has the burden with respect to its necessity for an effective reorganization. 11 U.S.C. § 362(g).

To establish the amount and the validity of its claims, and the value of the Warehouse, the Mortgageholder relies upon the Summary of Schedules filed by the Debt-

---

**51.** Bankruptcy Code section 362(g) provides, in relevant part:

> In any hearing under subsection (d) ... of this section concerning relief from the stay of any act under subsection (a) of this section—
>
> (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

> (2) the party opposing such relief has the burden of proof on all other issues.
>
> 11 U.S.C. § 362(g).

**52.** Debtor Opp. # 2 at ¶ 5(ii).

**53.** Debtor Opp. # 2 at ¶ 5(i).

**54.** Debtor Opp. # 2 at ¶¶ 8–12.

or,[55] which set forth the value of the Warehouse ($1,600,000);[56] show amounts due (albeit as disputed) on the First Mortgage and Second Mortgage considerably exceeding that amount; and show those debts as secured. It also made a largely uncontested showing in this regard.[57] Thus there is no equity in the Warehouse unless the Court agrees with the Debtor that (a) the alleged settlement prohibits the Mortgageholder from seeking any remedies with respect to the First Mortgage, or (b) the $700,000 in debt associated with the Second Mortgage (or at least the great bulk of it), is not secured, because it was a fraudulent conveyance or otherwise.

### (a) Settlement Agreement

■ The first of the Debtor's two arguments is its contention that the First Mortgage was purchased by Sterling in bad faith and in violation of a settlement agreement that was entered into between Sterling and Gordon Ash, on behalf of the Debtor—under which the Debtor would surrender the deed to the Warehouse to Sterling, in exchange for a release of personal guaranties by the Debtor's principals of the loan underlying the Second Mortgage, and Gordon Ash would participate in

any negotiated reduction of the amount due on the First Mortgage.

In response, the Mortgageholder argues that the settlement was to be submitted to Sterling's management for approval, and that no such agreement was ever obtained.[58]

The Debtor does not even establish a disputed issue of material fact in this regard. Each of the two documents stated expressly, as noted above in the Court's findings of fact, "[p]lease indicate your approval of the following terms *so that I may seek Sterling management's approval for same.*" The documents said to comprise the alleged settlement agreement do not reflect the approval of Sterling's management,[59] and the Katz affidavit's assertion that such approval was never forthcoming is undisputed. Nor do the documents signify any commitment on the part of Sterling to seek such approval, or the authority of Mr. Katz to bind Sterling pending such approval. To the extent they say anything, they indicate that Sterling management approval would be a requirement for any agreement.

The Court finds, as a conclusion of law or a mixed question of fact and law, that the purported settlement agreement pres-

---

**55.** *See id.* at 901, n. 8 ("The Debtor's acknowledgment of a valid security interest in its petition or schedules can also constitute prima facie evidence of this element.").

**56.** *See* Debtor's Schedules, Docket Entry # 1, Schedule A ("Real Property").

**57.** *See* Debtor's Schedules, Docket Entry # 1, Schedule D ("Creditors Holding Secured Claims"), showing $1,300,000 as due on First Mortgage and $700,000 on Second Mortgage. The Debtor did not dispute the Mortgageholder's assertions in its papers that higher amounts were due on the First Mortgage and Second Mortgage, respectively, or that the First Mortgage was duly secured; it did, however, dispute whether the Second Mortgage

was secured, and, indeed, whether it was an obligation at all, a contention that is discussed below.

**58.** More precisely, it argues that the documents on which the Debtor relies do not constitute a settlement agreement, but, to the contrary, represented the Debtor's terms of settlement, put in writing for the purpose of presenting them to Sterling's management, for its consideration, and never agreed to by Sterling's management. *See* Affidavit of Sterling's Benjamin Katz, dated April 16, 2000 (*sic.*), ¶¶ 4–5, included with Mortgageholder's Reply # 1.

**59.** Indeed, one of them does not even reflect the agreement of the Debtor.

ents a classic case of preliminary negotiations that never ripened into a contract. Under New York law, which the Court considers it appropriate to apply here,[60] standards for analyzing the issue as to whether a preliminary agreement is a binding contract, on the one hand, or whether it is an unenforceable agreement to agree, on the other, were expressed by Judge Leval (then in the Southern District, now on the Second Circuit) in *Teachers Insurance & Annuity Association of America v. Tribune Co.*, 670 F.Supp. 491, 497–503 (S.D.N.Y.1987) ("*TIAA–Tribune*"), and applied in numerous Second Circuit decisions. *See Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 71–73 (2d Cir.1989); *Shann v. Dunk*, 84 F.3d 73, 77–78 (2d Cir.1996); *Adjustrite Systems, Inc. v. Gab Business Services, Inc.*, 145 F.3d 543, 547–551 (2d Cir.1998).

■■ It is a fundamental principle of contract law that no contract can be formed unless the parties intend to be bound. *See Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir. 1985); *In re Atlantic Computer Systems Inc.*, 142 B.R. 659, 660 (Bankr.S.D.N.Y. 1992) (Lifland, J.), *aff'd* 154 B.R. 166 (S.D.N.Y.1993). "Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs." *R.G. Group, Inc., v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984) (citations omitted).

■ A primary concern for courts that are confronted with this issue is "to avoid trapping parties in surprise contrac-

tual obligations that they never intended." *TIAA–Tribune*, 670 F.Supp. at 497. As Judge Leval stated in *TIAA–Tribune:*

> Ordinarily in contract negotiation, enforceable legal rights do not arise until either the expression of mutual consent to be bound, or some equivalent event that marks acceptance of offer. Contractual liability, unlike tort liability, arises from consent to be bound (or in any event from the manifestation of consent). It is fundamental to contract law that mere participation in negotiations and discussions does not create binding obligation, even if agreement is reached on all disputed terms. More is needed than agreement on each detail, which is overall agreement (or offer and acceptance) to enter into the binding contract.

*Id.; see also Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257 (2d Cir.1984), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984) (prospective seller was not bound by alleged contract to sell its subsidiaries where documents and testimony showed intent of both parties was not to be bound until execution of a formal written contract); *Winston*, 777 F.2d at 80 (reversing district court and concluding parties never entered into binding settlement agreement); *Brause v. Goldman*, 10 A.D.2d 328, 332, 199 N.Y.S.2d 606, 611 (1st Dep't 1960), *aff'd*, 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961) (necessary finality of assent is lacking where parties have clearly expressed an intention not to be bound until their preliminary negotiations have culminated in the execution of a formal contract).

**60.** The documents said to embody the alleged settlement agreement were silent as to their choice of law, but where the dispute is between two New York entities and involves real estate in New York, and New York is the only jurisdiction with an interest in the controversy, New York law plainly applies. The Court indicated to the two sides its inclination to rely on the Second Circuit and Southern District of New York authorities that applied New York law to disputes of this nature, *see* Hrg. # 1 Tr. at. 49–51, and neither party objected or expressed any contrary view.

■ To determine whether an alleged settlement agreement should be deemed binding, this Court must "determine the intentions of the parties at the time of their entry into the understanding, as well as their manifestations to one another by which the understanding was reached." *TIAA–Tribune,* 670 F.Supp. at 499; *accord Adjustrite Systems,* 145 F.3d at 548; *Winston,* 777 F.2d at 80 (to discern intent a court must look to "the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.") (quoting *R.G. Group,* 751 F.2d at 74).

In applying the principles set forth above to this case, the Court concludes that the documents alleged to comprise a binding settlement agreement fail to meet the requirement for such under New York law. The express language of each of the two documents clearly shows that Sterling did not intend to be bound until further documents were signed and executed. Both state: "[p]lease indicate your approval of the following terms *so that I may seek Sterling management's approval for same."* (emphasis added). Although there apparently were understandings as to the contours of a deal to be presented to Sterling Management, the assent of Sterling Management—expressly contemplated under each letter—has not been shown to exist.

Moreover, to the extent other documentation relevant to this issue has been presented to the Court, it reinforces the conclusion that no earlier binding settlement agreement was reached. Thus it appears that the parties were still negotiating this matter as late as April 2001, as evidenced by an offer of settlement set forth in a letter, dated April 4, 2001, from Kenneth Elan, an attorney claiming he was going to be retained by Jonathan Ash.[61] As the Mortgageholder correctly points out, the fact that such an offer of settlement was made on behalf of Jonathan Ash and Marc Breslaw evidences their belief that there was no settlement agreement then in effect.

■ The Court is mindful of two competing interests: on the one hand, courts should enforce agreements that were intended to be binding, notwithstanding a need for further documentation or negotiation, while, on the other hand, "courts must be wary of 'trapping parties in surprise contractual obligations that they never intended' to undertake." *Adjustrite Systems,* 145 F.3d at 548 (citing *TIAA–Tribune,* 670 F.Supp. at 497; *Arcadian,* 884 F.2d at 72). As Judge Leval noted in *TIAA–Tribune,* "[t]here is a strong presumption against finding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." 670 F.Supp. at 499 (language of the agreement argued persuasively for overcoming this presumption where letter described itself as a "binding agreement"); *Arcadian Phosphates,* 884 F.2d at 73 (language of agreement argued for letting the presumption stand).

Significantly, and in stark contrast to *TIAA–Tribune* and like cases, neither letter said to comprise the alleged settlement agreement states that it is a "binding agreement," or words of like import. To the contrary, each of them, although signed by Ben Katz of Sterling, was expressly contingent upon approval by Sterling management. Thus, looking at the plain language of the transmittals (where the language is the most important factor for indication as to whether the parties considered the transmittals binding or

---

61. *See* Mortgageholder Reply # 1, Exhibit I.

whether they intended not to be bound until the conclusion of final formalities, *see TIAA–Tribune*, 670 F.Supp. at 499, *Adjustrite Systems*, 145 F.3d at 549, *Arcadian Phosphates*, 884 F.2d at 72), and in the absence of any showing that other factors trump this obvious manifestation of the parties' intent, or to dispute the statements in the Katz affidavit, the Court concludes that no showing of an enforceable settlement agreement has been made. *See also Atlantic Computer Systems*, 142 B.R. at 660 (plain language of agreement demonstrated an intent not to be bound).

### (b) Fraudulent Conveyance?

The second of the two arguments that the Debtor makes in resisting relief from the stay is a contention that, in substance, part of the Debtor's secured debt in favor of the Mortgageholder should be ignored. The Debtor asks the Court to disregard the totality of the mortgage debt on the Warehouse, arguing that the Second Mortgage, which the Debtor executed in favor of Sterling, was a fraudulent conveyance that should be avoided for the reason that the Debtor did not receive equivalent value. The Debtor argues that it did not receive equivalent value or fair consideration for the mortgage it gave because an entity separate from the Debtor, the Related Corporation, ultimately received the proceeds of the loan. The Debtor promises the early commencement of an adversary proceeding to recover the fraudulent conveyance, and/or to invalidate the Second Mortgage Lien.

However, the Mortgageholder responds that there was no such fraudulent conveyance, as (1) the Second Mortgage secured pre-existing obligations—otherwise known as an antecedent debt—of the Debtor to Sterling under the 1997 Guaranty; and (2) because loan proceeds ultimately went to the Debtor's affiliate, the Related Corporation, the Debtor received equivalent value for the Second Mortgage.

At the outset, however, the Court notes a matter of some import, which neither party addressed, and which must be considered as a threshold matter: to what extent can this Court, on a contested matter for relief from the stay, deny relief to a secured creditor, in the absence of a determination in an adversary proceeding invalidating the secured creditor's lien?

The law in this regard is not uniform. *See, e.g., and compare, In re Montgomery*, 262 B.R. 772 (8th Cir. BAP 2001) (affirming bankruptcy court's refusal to consider debtor's fraudulent transfer theory as a defense to motion for relief from the stay) [62] with *In re Poughkeepsie Hotel Associates*, 132 B.R. 287, 291 (Bankr. S.D.N.Y.1991) (Berk, J.) (holding that affirmative defense of equitable subordination could be considered as a defense to motion for relief from the stay).[63]

---

**62.** The *Montgomery* court noted that the proceedings on a motion for relief from stay are "summary in character." 262 B.R. at 775 (citing *In re Vitreous Steel Products Co.*, 911 F.2d 1223, 1232 (7th Cir.1990)). It went on to say that:

The issues are those identified in the text of the governing statute: whether the movant's interest in property of the bankruptcy estate is adequately protected; the existence of other "cause" to terminate the stay, dependent on the facts and circumstances of the individual case; and, in the case of encumbered property of the estate, the existence of equity in it and its necessity to an effective reorganization of the debtor. *Id.*

**63.** In *Poughkeepsie Hotel Associates*, Judge Berk noted:

[A] more expansive approach to what may be asserted in opposition to a relief from stay motion has evolved. The "interests of judicial economy and the speedy and economical determination of litigation" supports the consideration of affirmative de-

██ As this Court has previously noted, *see In re Dabrowski*, 257 B.R. 394, 408 (Bankr.S.D.N.Y.2001) (Gerber, J.), where there is no controlling Second Circuit authority, this Court follows the decisions of other Bankruptcy Judges in the Southern District of New York, at least in the absence of clear error. For that reason, the Court considers it appropriate to follow *Poughkeepsie Hotel Associates*, and the Court also considers it appropriate to take the *Poughkeepsie Hotel Associates* approach in a case, like this one, where the affirmative defenses or counterclaims directly involve the question of the debtor's equity,[64] or where, if the court declined to consider the defense on the motion for relief from the stay, that might have the practical effect of removing the issue from effective judicial consideration.[65]

 Judge Berk noted that whether a particular defense or counterclaim is properly asserted in stay litigation is ultimately within the court's discretion. *See Poughkeepsie Hotel Associates*, 132 B.R. at 291. In this respect, the Eighth Circuit B.A.P. agreed, at least as to controversies of this character. *See Montgomery*, 262

B.R. at 775 (in its discretion, the court may consider evidence that the movant's interest as secured party or as post-foreclosure owner is potentially vulnerable to avoidance). In the exercise of its discretion, this Court will consider the Debtor's defenses here.

██ On the merits, however, the Debtor has wholly failed to respond, so far as the Court can discern, to the Mortgageholder's antecedent debt point, and the Debtor's defense fails for that reason. Two Bankruptcy Code sections enable a trustee, including a debtor-in-possession, to avoid a transfer that is fraudulent as to creditors. Relevant here is section 548 of the Code, which provides, in relevant part:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or

fenses in relief from stay litigation. *In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1287 (2nd Cir.1990). A challenge to the validity of the underlying lien may be asserted by affirmative defense. *See, e.g., In re Davenport*, 34 B.R. 463, 466 (Bankr. M.D.Fla.1983) ("when the affirmative defense contests the validity of the lien at issue, such affirmative defense should be considered in determining whether or not the automatic stay should be lifted or extended"); *In re Lockwood*, 14 B.R. 374 (Bankr.E.D.N.Y.1981). Likewise, failure to perfect a secured claim has been allowed as a defense to a motion for relief from the automatic stay. *First National Bank of Denver v. Turley*, 705 F.2d 1024 (8th Cir. 1983); *In re Appeal of U.I.P. Engineered Products Corp.*, 43 B.R. 480 (N.D.Ill.1984). *Id.* at 291. He added, however, that "[e]xtrinsic defenses and counterclaims unrelated to stay litigation should be disallowed." *Id.*

64. Where affirmative defenses or counterclaims "directly involve the question of the debtor's equity, they should be heard in the stay proceeding." *In re Bialac*, 694 F.2d 625, 627 (9th Cir.1982).

65. An example of this might be one where the defense is unique to bankruptcy law, or might not be capable of consideration in an appropriate manner in state court. *See, e.g., Poughkeepsie Hotel Associates*, 132 B.R. at 292:

Matters "which may be maintained only in the bankruptcy forum and could not be raised as affirmative defenses in a state court" deserve particular consideration. *In re Davenport*, 34 B.R. at 466. If the automatic stay is terminated and the movant allowed to foreclose, the estate would be deprived of these defenses in the nonbankruptcy forum.

*Id.*

after the date that such transfer was made or such obligation was incurred, indebted; or

(B) (i) received less than a reasonably equivalent *value* in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548 (emphasis added).[66]

While there is apparent agreement that the giving of the mortgage qualified as the necessary transfer of property,[67] the key determinant is the Code's definition of the "value" that must be received in exchange. Section 548(d)(2)(A) provides that:

"[V]alue" means property, or satisfaction or *securing of* a *present or antecedent debt of the debtor,* but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor.

(Emphasis added).

▮ Thus, by its terms, the Code provides that the Debtor receives value when its delivery of property secures a present or antecedent debt of the debtor. As the Second Circuit held in *Rubin v. Manufacturers Hanover Trust Co.,* 661 F.2d 979 (2d Cir.1981) (under the old Bankruptcy Act):

[I]f the debtor receives property or discharges or secures an antecedent debt that is substantially equivalent in value to the property given or obligation incurred by him in exchange, then the transaction has not significantly affected his estate and his creditors have no cause to complain.

*Id.* at 991.

Numerous bankruptcy courts and district courts have held likewise. *See In re 550 Les Mouches Fashions, Ltd.,* 24 B.R. 509, 516 (Bankr.S.D.N.Y.1982) (Beatty (Abram), J.) ("The granting of the security interest to Lady Hope was for value as the outstanding indebtedness, although antecedent, constituted value within the mean-

---

66. Also permitting the avoidance of a fraudulent transfer is Bankruptcy Code section 544, which gives the trustee or debtor-in-possession the rights of a creditor as of the date of the petition and permits the trustee or debtor-in-possession to invoke local law respecting fraudulent conveyances, such as the Uniform Fraudulent Conveyances Act (codified in New York as New York Debtor & Creditor Law ("DCL") §§ 270–281), Uniform Fraudulent Transfer Act, or other state law. The Debtor has not contended, however, that section 544 gives the Debtor any rights that section 548 does not. For instance, while the Uniform Fraudulent Conveyance Act, implemented in New York's DCL, speaks in terms of "fair consideration" instead of reasonably equivalent value:

Fair consideration is given in exchange for property or an obligation when "as a fair equivalent therefor, and in good faith, property is convey or an antecedent debt is satisfied" or when it is "received in good faith *to secure* a present advance or *antecedent debt in amount not disproportionately small*" to the value of the property transferred or obligation incurred.

5 *Collier on Bankruptcy* ¶ 548.05[1][b] at page 548–41 (15th Ed. Rev.).

67. A "transfer" is defined in § 101(54) as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption." Giving a mortgage plainly qualifies as such.

ing of Bankruptcy Code § 548(d)(2)(A)"); *In re Countdown of Connecticut, Inc.*, 115 B.R. 18, 21 (Bankr.D.Conn.1990) (Shiff, C.J.) ("Under Code § 548(d)(2)(A) an antecedent debt constitutes value for the granting of a security interest.... Thus, I agree with the defendant that the transfer of the security interest by the debtor did not have to be contemporaneous with the defendant's loan to the debtor and conclude that the transfer of the loan proceeds constituted value for the transfer of the security interest.") [68]; *Anand v. National Republic Bank of Chicago (In re Anand)*, 239 B.R. 511, 517 (N.D.Ill.1999) ("There is no dispute that collateralization of an antecedent debt confers value on the debtor, since the bankruptcy statute's definition of 'value' includes 'securing of a present or antecedent debt of the debt-or.'"); *In re Abraham*, 33 B.R. 963, 967 (Bankr.M.D.Fla.1983) (Paskay, J.) ("It is a well accepted proposition that a pre-existing or antecedent debt may constitute sufficient consideration to support a mortgage."). *See also* Weintraub & Resnick, *Bankruptcy Law Manual*, ¶ 7.06[8] at page 7–61 (Value "may consist of ... the satisfaction or securing of either a present or an antecedent debt. Thus an insolvent debtor receives value by paying an old obligation. For this reason, making a preference in good faith is not a fraudulent conveyance because value is exchanged by the cancellation of the antecedent debt"). [69]

Indeed, *Abraham*, decided by Judge Paskay, has substantial similarity to our case:

> There is no doubt that the language [of the mortgage, securing all debt "now

---

**68.** Judge Shiff also drew upon commentary with respect to Connecticut's fraudulent conveyance statute:

> Despite the plain language of [that statute], several parties have argued that a creditor does not give value if he takes his security interest to secure a pre-existing claim against the debtor. On this point, the courts have tossed these parties out on their ears, as well they ought.

*Id.* at 21 n. 3 (citing J. White & R. Summers, *Uniform Commercial Code* § 23–4, at 915 (2d ed.1980)).

**69.** Notwithstanding doctrine that the value of the property conveyed should not be disproportionately large as compared with the amount of the advance of a debt secured, *see, e.g., Abraham*, 33 B.R. at 968, the Court need not, and does not, make a quantitative comparison of the amount of the antecedent debt and the value of the collateral (or the gross amount of the mortgage) at the time of the transfer. As the *Anand* bankruptcy court (later affirmed by the district court, whose opinion is cited above) held:

> It is obvious that when dealing with the exchange of one asset for another, the court must compare the value of what the debtor surrendered with what the debtor received. *In re Bundles*, 856 F.2d 815, 824 (7th Cir. 1988). But here the Debtor did not give up all of his interest in the Mokena property;

> he only gave the bank an interest in that property sufficient to secure payment of his debts. The difference is critical.
>
> A secured creditor does not own the collateral securing a debt; the creditor has no rights in the collateral except as necessary to protect the claim. The debtor continues to own the property; the secured creditor has only the right to force its liquidation for the sole purpose of paying the secured debt. A secured creditor is not entitled to collect more than the amount of the debt from such a liquidation of the collateral. Any collateral value in excess of the debt is available to satisfy other creditors. *Unisys Finance Corp. v. Resolution Trust Corp.*, 979 F.2d 609, 611 (7th Cir.1992). The debtor, notwithstanding the transfer of a security interest, can realize the value of the collateral in excess of the debt by selling the property or borrowing on a junior lien. The value of the property, beyond the amount of the debt, is therefore not lost to the debtor or other creditors as a result of the transfer.

*In re Anand*, 210 B.R. 456, 458–459 (Bankr. N.D.Ill.1997), *aff'd* 239 B.R. 511, 517 (N.D.Ill. 1999). The *Anand* court further stated:

> [T]here is authority that whether an exchange involving the collateralization of an antecedent debt constitutes the receipt of less than reasonably equivalent value is a

due" or as "may be due"] quoted intended to secure all debts owed by the Debtors to the Bank whether the debt was an antecedent unsecured debt or a debt based on a possible future advance. It is without dispute that at the time the Debtors executed the mortgage under consideration in Ft. Myers, they were already heavily indebted to the Bank. The record clearly shows that in March, 1982, there was a substantial antecedent debt which was more than ample to furnish a legally sufficient consideration to support the mortgage and the security interest granted by the Debtors.

33 B.R. at 968.

It may be that the Debtor has confused a fraudulent conveyance with a preference. If a debtor gives a mortgage to secure a debt it already has—an antecedent debt—

and meets the other statutory requirements (such as, *inter alia*, insolvency, a transfer within the statutory time period, and the requirement that the recipient receive more than it would in a chapter 7 liquidation [70]), the giving of that mortgage may be a preference, but it is not a fraudulent conveyance. As an obvious corollary, the underlying antecedent debt does not disappear.[71]

Given the foregoing analysis, the Court does not need to reach, and does not reach, the understandable, but considerably less than clear, second argument advanced by the Mortgageholder, that the debtor received an economic benefit through a benefit to a related third person.[72]

### 2. Necessary for Reorganization?

■ Finally, and based on everything the Debtor has shown this Court to date,

---

question of fact. Under this rule, the value of the collateral is significant to determine whether the debtor received reasonably equivalent value. *In re Countdown of Connecticut, Inc.*, 115 B.R. 18 (Bankr.D.Conn. 1990). This court disagrees and holds that as a matter of law collateralizing an antecedent debt cannot constitute less than reasonably equivalent value regardless of the value of the collateral. This is so, again, because, from the perspective of the debtor, the value of the interest in the collateral transferred to the creditor can never be more than the amount of the debt. The value of the collateral is therefore irrelevant to the ultimate question because the excess over the debt is not lost to the debtor or other creditors. *Id.* at 459. To ensure this, the Court is protecting the estate, in this regard, by providing that as a condition to relief from the stay, the Mortgageholder will account to the estate for, and turn over, any foreclosure proceeds received in excess of the amount of its outstanding debt.

70. *See* Bankruptcy Code section 547(b).

71. Of course, if and to the extent that the secured lender could realize more on the

property than the total of the antecedent debt, and/or the value of the property turned out to exceed the debt, resulting in equity for the estate, the secured creditor would have to turn over the difference to the estate. Based on the numbers that have been put forward in this case, that scenario has no present, and is unlikely to have a future, relevance here, but the Court will order, as a condition to relief from the stay, that the Mortgageholder turn over any excess proceeds.

72. This case does not appear to be one where a corporate parent incurred debt for the benefit of its subsidiary, and the subsidiary itself was an asset of its estate, *compare In re W.T. Grant Company*, 699 F.2d 599, 609 (2d Cir. 1983), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983) (under the former Bankruptcy Act) (where subsidiary received benefits, parent received fair consideration for its guaranty); where an obligation incurred by one unit of a jointly operating entity conferred a benefit on both units; *compare In re Augie/Restivo Baking Co.*, 87 B.R. 242, 244, 247–248 (Bankr.E.D.N.Y.1988) (where Manufacturers Hanover made advances to Augie/Restivo combined operation secured by mortgage on property owned by Augie's, mortgage was not a fraudulent conveyance; "since ... the

the Court is not in a position to conclude, and does not conclude (as either a conclusion of law or mixed question of fact and law) that the Warehouse is necessary for an effective reorganization.

The Debtor's reorganization plan, as originally conceived and articulated, seemed to call for success in making at least some of the secured debt on the Warehouse go away, thereby providing equity in the Warehouse and providing a means to pay the remaining debt under time, pursuant to Bankruptcy Code sections 1124 and/or section 1129(b)(2)—and allowing equity (i.e., the Debtor LLC's members) to retain their interests in the Warehouse. However, the Debtor's contemplated reorganization plan was modified, just before Hearing # 2, to call for the funding of the plan by Mr. Impagliazzo, providing him or his designee the right to occupy the Warehouse, in exchange for a 95% interest in the LLC, and stretching out the payments on the secured debt (or paying it off, presumably if refinancing efforts, discussed but not committed to, were successful)—though significantly reserving the right to object to the extent and validity of the First and Second Mortgage.

Even as modified the proposed plan was silent with respect to a number of critical issues with respect to the ability to confirm a plan of reorganization in this case, including:

(a) the treatment of the class of non-priority unsecured claims (which would include the Mortgageholder's deficiency claim, of approximately $650,000), *see* Bankruptcy Code section 1123(a)(3);[73]

(b) the Bankruptcy Code's requirements for obtaining the acceptance of one impaired class (without including acceptance by any insider), *see* Bankruptcy Code section 1129(a)(10);

(c) the Bankruptcy Code's "Absolute Priority Rule," which is applicable when a junior class (like equity here) would keep an interest when all senior creditors have not been paid in full;[74] and

(d) the applicability of principles announced by the United States Supreme Court in *Bank of America Nat'l Trust and Sav. Ass'n v. 203 North LaSalle St. Partnership*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999), which had held that a debtor's prebankruptcy equity holders could not, over the objection of senior class of impaired creditors, contribute new capital and receive ownership interests in a reorganized entity without allowing others to compete for that equity or to propose a competing reorganization plan.

Apart from the issues above, which do not appear to have been addressed, the Debtor now will likely have the difficult task of confronting the need to satisfy, as part of any reorganization plan, the entirety of the secured debt on the Warehouse. That will require the Debtor and/or Mr.

---

two corporations were operating as a single economic unit, it is virtually impossible for money to have been advanced to one without benefit to the other"); or where consideration given by an affiliate ultimately results in property in the debtor's hands, or otherwise confers an economic benefit upon the debtor. *Compare Rubin*, 661 F.2d at 991–992.

**73.** That provision provides that a plan shall "specify the treatment of any class of claims or interests that is impaired under the

plan...." A similar requirement exists with respect to any class that is not impaired, *see* Code section 1123(a)(2), though it is difficult to see how, under the facts here, the Debtor could satisfy unsecured claims in such an apparently large amount without impairing the class of unsecured claims.

**74.** *See* Bankruptcy Code section 1129(b)(1), requiring that it be "fair and equitable," thereby incorporating the Absolute Priority Rule as developed under common law.

Impagliazzo to satisfy, as secured claims, both the First Mortgage and the Second Mortgage, up to the value of the Warehouse, and to make satisfactory plan provisions to satisfy, as unsecured claims, the Mortgageholder's deficiency claims and/or Sterling's unsecured guaranty claim (recognizing that there is likely to be a considerable overlap between the two), and any other unsecured claims (though these would likely be minimal).

Theoretically, it is possible that Mr. Impagliazzo might be of a mind to invest that much, and/or the Debtor's principals could raise it and choose to invest it, and that *203 North LaSalle* concerns could be overcome, but such is hardly likely. By definition, it will require one or the other of them to invest more than the Warehouse is worth.

Given these circumstances, the Court concludes that the Debtor has not satisfactorily shown that an effective reorganization is possible, let alone reasonably likely within a reasonable period of time. The Court further concludes, accordingly, that the Debtor has not established that the Warehouse is necessary to an effective reorganization within the meaning of § 362(d)(2)(B). As the Supreme Court explained in *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), once lack of equity is shown, the debtor must establish that the collateral is necessary for an effective reorganization, not by showing that, absent retention of the Property, no reorganization is possible, but by proving "the property is essential for an effective reorganization *that is in prospect.*" *Id.* at 375–376, 108 S.Ct. at 633 (emphasis in original).

The absence of that here makes it inappropriate to deny relief by reason of an argument that the Warehouse is needed for a successful reorganization. *See also*

*In re Pegasus Agency Inc.*, 101 F.3d 882, 886 (2d Cir.1996) (reversing district court and holding the debtor was not entitled to the continuation of the automatic stay where proposed reorganization plan had no reasonable prospect of success); *Diplomat Electronics,* 82 B.R. at 693 ("Where the debtor has not shown that it can obtain confirmation of a plan, it has not met its burden of showing that the property is necessary to an effective reorganization."); *In re Boca Development Associates,* 21 B.R. 624, 630 (Bankr.S.D.N.Y.1982) (Schwartzberg, J.) (modifying stay to allow mortgagee to proceed with foreclosure action where, among other things, debtor failed to establish an "effective" reorganization was likely within the near future).

### Section 362(d)(1)

■ The Mortgageholder secondly argues that there exists "cause" to warrant relief from the automatic stay pursuant to § 362(d)(1) for the reason that the Mortgageholder is not adequately protected. It bases the argument on several contentions: (1) the Debtor has failed to make monthly payments under the First Mortgage for over one year, has failed to make monthly payments under the Second Mortgage for approximately one year, and will be unable to make post-petition interest payments since the Debtor has no income; (2) the Debtor has not paid real estate taxes for the 2000–2001 tax year; (3) the Debtor has not demonstrated to the Mortgageholder's satisfaction that it has maintained insurance for the Warehouse; and (4) the Debtor has failed to collect rent from its current tenant and has impermissibly used the tenant's security deposit to pay expenses.

The Mortgageholder also argues the Debtor filed this chapter 11 case in bad faith, where it was filed solely to impede the foreclosure of the First Mortgage, and

where it was filed less than one month after the dismissal of the Debtor's prior chapter 11 case in the District of New Jersey, during which there were no changes in circumstances to warrant the filing of the Debtor's second petition.

 The failure to provide adequate protection when the property is declining in value is a classic basis for granting relief from the stay for cause. *See, e.g., Elmira Litho*, 174 B.R. at 902. While the existence *vel non* of a decline in the value of the secured creditor's interest "is almost decisive in determining the need for adequate protection," *see id.*, and there here has been no showing in quantitative terms that the Warehouse is declining in value, a secured creditor can sometimes prove its case qualitatively. *Id.* at 903. As Chief Judge Bernstein held in *Elmira Litho:*

> Without quantifying the decline in value, the creditor can often establish its prima facie case by demonstrating that the debtor has completely failed, or substantially failed, to make post-petition payments.

*Id.* (numerous citations omitted). He continued: "This approach may have appeal if the debtor uses the secured creditor's property during the case, but makes no post-petition payments." *Id.*

That, of course, is exactly what we have here. The Debtor has failed, since the inception of this case, to make any post-petition payments, or to proffer them. This is exactly the kind of abuse that Congress sought to address when adding section 362(d)(3) to the Code to apply to cases, like this one, involving single asset real estate. While the time for payments under section 362(d)(3) has only now come to pass, the Court notes, and follows, the caselaw authority set forth in *Elmira Litho* and the cases cited therein for relief from the stay, under section 362(d)(1), for

cause, where no adequate protection payments whatever have been made or proffered. In the absence of adequate protection payments, the Court concludes that cause for relief from the stay has been shown. *See Boca Development*, 21 B.R. at 630–631 (relief warranted under § 362(d)(1) where, among other things, taxes on subject property continued to accrue, no income was derived from the property, no mortgage payments were being made and no periodic payments or additional liens were offered).

 The Mortgageholder's second basis for relief from the stay for cause is its argument that the Debtor filed this bankruptcy case in bad faith. It is well settled, of course, that the filing of a bankruptcy petition on the eve of a foreclosure or eviction does not, by itself, establish a bad faith filing or "cause" for relief from the stay. *See, e.g., In re 234–6 West 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y.1997) (Brozman, C.J.) (so noting); *In re Eclair Bakery Ltd.*, 255 B.R. 121, 137 (Bkrtcy.S.D.N.Y.2000) (Gerber, J.) (citing *234–6 West 22nd St. Corp*). It is only one of several indicia that a court may appropriately look to in determining whether, under the totality of the circumstances, resort to the Bankruptcy Code has been in good faith, on the one hand, or inappropriate, on the other.

But the Second Circuit has commented on the importance of resort to the bankruptcy laws of the United States in good faith:

> The good faith standard applied to bankruptcy petitions "furthers the balancing process between the interests of debtors and creditors which characterizes so many provisions of the bankruptcy laws and is necessary to legitimize the delay and costs imposed upon parties to a bankruptcy."

*In re C–TC 9th Ave. Partnership*, 113 F.3d 1304, 1310 (2d Cir.1997) (affirming dismissal of case, under Code 1112(b), for bad faith filing). For that reason, as in *Eclair Bakery, see* 255 B.R. at 137, this Court considers it appropriate to focus on whether the Debtor and its principals have played by the rules; have met their obligations under the Bankruptcy Code; and have "done equity" when invoking the equitable protections the Bankruptcy Code provides.

While each of Code sections 707(a), 1112(b), 1307(c) and 362(d)(1) states that the authority it provides—dismissal or relief from stay, respectively—may be granted for "cause," and lists one or more examples of cause, each precedes the list with the word "includes," and none of those lists is exhaustive. Cause, for either dismissal or relief from the stay, may be found based on unenumerated factors, including "bad faith," *see C–TC 9th Ave. Partnership*, 113 F.3d at 1313, or failure to deal with creditors fairly even where "bad faith" is not found. *See In re Head*, 223 B.R. 648, 653 (Bankr.W.D.N.Y.1998) (Kaplan, C.J.) (dismissing chapter 11 and 13 cases for "non-enumerated" cause, by reason of unfair debtor practices); *Eclair Bakery*, 255 B.R. at 137–138. *See also In re Hudgins*, 188 B.R. 938, 946 (Bankr. E.D.Tex.1995) ("cause" under section 362(d)(1) is not limited to those situations where the property of a party lacks adequate protection; instead, "cause" "encompasses many different situations").

As Judge Brozman noted in *234–6 West 22nd St.* (wherein she granted relief from the stay, under section 362(d)(1), by reason of bad faith filing), "the standards for bad faith as evidence of cause," whether in the context of dismissal or relief from the stay, "are not substantively different from each other." 214 B.R. at 757; *see also In re*

*Setzer*, 47 B.R. 340, 344 (Bankr.E.D.N.Y. 1985) ("[b]ad faith has frequently been held to provide sufficient cause to warrant both types of relief"); *Eclair Bakery*, 255 B.R. at 138 (citing *234–6 West 22nd St.* and *Setzer*). She cautioned, in this connection, that the concept of bad faith filing should be used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances. *Id.* She then continued:

> [W]hen faced with a motion to lift the stay on bad faith grounds, a judge must conduct a careful analysis similar to that performed with a motion to dismiss a case on bad faith grounds. In both cases, the relief sought is an extraordinary remedy that requires careful examination of the facts on a case-by-case basis. But where the circumstances require such relief, and the cases granting both types of motions are legion, a judge must not shrink from ordering it.

*Id.*

Standards for consideration of bad faith filing were set forth in *C–TC 9th Ave. Partnership, see* 113 F.3d at 1311, which were applied to a single asset real estate case in *234–6 West 22nd St.* Indeed, this case has substantial similarities to *234–6 West 22nd St.*, where Judge Brozman granted relief from the stay for cause. *See* 214 B.R. at 761. There indicia of bad faith that ultimately provided grounds for relief from the stay included, among other things, the debtor's failure to pay its secured creditors and taxes; that the debtor was a single asset real estate that generated no income and that was the subject of a foreclosure action; the debtor filed a previous chapter 11 case that was dismissed for its inability to reorganize; there were very few unsecured creditors; and there were no changed circumstances that justi-

fied a second chapter 11 filing.[75]

Here, under the totality of the circumstances, the Court finds this case to be indistinguishable in relevant respects from *234–6 West 22nd St.*, and applying criteria in that case and *C–TC TC 9th Ave. Partnership*, the Court concludes that this case should be dismissed for cause for substantially the same reasons. Here the Debtor has only one asset, the Warehouse. It has no employees. It produces no income, and has no discernible cash flow. It has very few unsecured creditors (especially non-insiders), and none, so far as the Court can determine, that would be helped by a chapter 11 reorganization. (Indeed, the two largest unsecured claims—though recognizing the likelihood that they will overlap—are those of the Mortgageholder and Sterling, affiliates of each other who support relief from the stay.) The Warehouse is the subject of a foreclosure action as the result of arrearages on the Mortgageholder's secured debts. The case is essentially a two-party dispute between the Mortgageholder and the Debtor, and the timing of the Debtor's entry into bankruptcy (initially in New Jersey) has caused the Court to find as a fact that the Debtor timed its bankruptcy filing so that it could avail itself of the automatic stay in order to stop the foreclosure action.[76]

Likewise, factual findings made by the Court as listed above further cause the Court to believe that dismissal of this case is warranted:

- The case was filed for the predominant purpose, if not the sole purpose, of

blocking measures by the Mortgageholder to foreclose on the Warehouse, and in particular to utilize the automatic stay provided by section 362 of the Bankruptcy Code with respect to the Warehouse to block Mortgageholder remedies;

- The Debtor sought to exploit section 362's automatic stay not for a temporary "breathing spell," but, rather, as a means to maintain ownership of the Warehouse without satisfying the debt associated with it, and to effect delay, and, if possible, a total blockage, of Mortgageholder remedies;

- The timing of the Debtor's filings evidences an intent to hinder, delay and/or frustrate the legitimate efforts of the Mortgageholder to enforce its rights; and

- Unsecured creditors would not benefit in any material way from the Debtor's filing, and would not be prejudiced in any material way as a result of relief from the stay.

Indeed, this case is more egregious than *234–6 West 22nd St.* in at least one respect—its attempt to use bankruptcy as a tactical step in connection with the Debtor's battles with the Mortgageholder, to sidestep the Debtor's obligations for money that was actually borrowed, and used by the Debtor in the manner that the Debtor had intended. As Judge Kaplan of the Western District of New York noted in *Head, supra:*

It is an extremely common occurrence that a debtor in Chapter 11, 12 or 13,

---

75. As discussed above, while many of the noted factors appear in both cases, this Court considers it inappropriate to consider the "repeat filing" factor here. The Court is prepared to accept the re-filing in this Court after the New Jersey dismissal as the consequence of good faith error, and notes, of course, that the New Jersey dismissal was not on the merits, and not for inability to reorganize.

76. While, as noted above, a bankruptcy filing on the eve of foreclosure is not *per se* indicative of bad faith, it is an appropriate factor to take into account as one of the many factors that must be considered.

wishes to move a vitriolic matrimonial proceeding, mortgage foreclosure, or tort suit into the bankruptcy forum, and then attempt to utilize the bankruptcy forum as a sword—a new weapon in the arsenal of vitriol. Without exception, this Court does not permit such a tactic. The rehabilitative chapters of the Code provide a means for a debtor to address his or her obligations with honesty of intention, by paying them in whole or in part. Those chapters are not a means to unfairly deflect accountability.

223 B.R. at 653.

Based upon the conclusions that there is a lack of adequate protection and the existence of "cause," this Court concludes that relief under section 362(d)(1), for cause, is warranted.

### Conclusion

Relief from the stay, under each of sections 362(d)(2) and 362(d)(1), is granted, subject to the duty of the Mortgageholder to account for, and to turn over to the estate, any proceeds of foreclosure in excess of the amount of its outstanding debt. Given the consequences of this decision to the Debtor, the 10–day stay of Rule 4001, Fed. R. Bankr.P., is not waived, so as to provide the Debtor with an opportunity to seek a stay pending appeal. Counsel for the Mortgageholder will prepare an order in accordance with the foregoing, which, if not agreed upon as to form by the Debtor, shall be settled on three business days' notice by hand or fax. The time to appeal from this Order shall run from the entry of the order, and not from the date of this Decision.