**In re ENGAGE, INC. et al., Debtors.**

Nos. 03–43655, 03–43656, 03–43657, 03–43659, 03–43661, 03–43662.

United States Bankruptcy Court, D. Massachusetts.

Oct. 8, 2004.

Andrew Z. Schwartz, Foley, Hoag & Eliot LLP, Boston, MA, for Liquidating Supervisor.

C. Hall Swaim, Wilmer, Cutler, Pickering, Hale and Dorr LLP, Boston, MA, for Liquidating Supervisor.

John G. Loughnane, Gadsby, Hannah LLP, Boston, MA, for Christopher Cuddy.

## MEMORANDUM OF DECISION ON MOTIONS OF DAVID WETHERALL, GEORGE MCMILLAN, ANDREW HAJDUCKY, AND CHRISTOPHER CUDDY FOR LEAVE TO FILE LATE CLAIMS

JOEL B. ROSENTHAL, Bankruptcy Judge.

This matter came before the Court for a hearing on the Motions of David Wethe-

rall, George McMillan, Andrew Hajducky [Docket # 518], and of Christopher Cuddy [Docket # 521] for Leave to File Late Claims, the Liquidating Supervisor's objection thereto [Docket # 526], and the Movants' reply [Docket # 532]. For the reasons set forth herein, the Motion of Wetherall, McMillan, and Hajducky is DENIED. The Motion of Cuddy is DENIED.

## BACKGROUND

Engage, Inc. ("Engage"), formerly known as Engage Technologies, Inc., was incorporated in Delaware in 1995 as a wholly-owned subsidiary of CMGI, Inc. ("CMGI"). In July 1999, Engage went public. From that point until September 2002, Engage operated as a majority-owned subsidiary of CMGI with CMGI owning approximately 80% of the stock of Engage. In September 2002 Engage and CMGI consummated what the Debtors and the Creditors' Committee refer to as the "September Transaction." As part of the September Transaction, CMGI canceled approximately $65 million in debt which it alleged was owed by Engage, and CMGI's shares of Engage stock were transferred back to Engage and subsequently canceled. Engage gave CMGI $2.5 million in cash and a $2 million non-interest bearing note secured by all of Engage's assets, and agreed to pay future earn-out payments. It also gave CMGI a warrant to purchase up to 9.9% of Engage stock.

Movant David Wetherall has been the chairman and secretary of CMGI since 1986. He previously served as CMGI's president until July 2001 and its chief executive officer until March 2002. Wetherall continued to hold what the Liquidating Supervisor describes as a "high ranking" position with CMGI "throughout the period of these bankruptcy proceedings." The Movants' Reply states that after March 2002 Wetherall "remained in the position

of a non-executive Chairman of the CMGI board. In that capacity, he attended periodic board meetings but was not responsible for the day-to-day management and affairs of the company." In addition to his positions at CMGI, from December 1995 to June 2002 Wetherall was also a director and chairman of the board of directors of Engage. On September 9, 2002 Engage, via Cuddy as its then president and CEO, and Wetherall executed an Indemnification Agreement whereby Engage agreed to indemnify Wetherall for actions undertaken by him as an officer or director of Engage.

From October 1995 to July 2001 Movant Andrew Hajducky was CMGI's treasurer and chief financial officer. He also served as a director of Engage during this period. The Movants' Reply states "Hajducky resigned from any position with Engage or with CMGI in approximately 2001, and did not have any day-to-day involvement or communication with CMGI or Engage thereafter."

Movant George McMillan replaced Hajducky as CMGI's treasurer and CFO, and took his seat on Engage's board, a position McMillan held until June 2002. On September 9, 2002 Engage, via Cuddy as its then president and CEO, and McMillan executed an Indemnification Agreement whereby Engage agreed to indemnify McMillan for actions undertaken by him as an officer or director of Engage.

McMillan also replaced Wetherall as CMGI's CEO in March 2002 and was appointed to CMGI's board in March 2002. McMillan also continued to hold what the Liquidating Supervisor describes as a "high ranking" position with CMGI "throughout the period of these bankruptcy proceedings," presumably as CMGI's CEO. The Movants' Reply states that "[w]hile George McMillan was, unlike the other three(3) Engage D & Os, employed full time by CMGI at the time the CMGI

complaint was filed, he was responsible for the overall management and operation of the company, including an on-going business restructuring, and did not have principal authority to review litigation."

Movant Christopher Cuddy was CMGI's vice president of corporate development until September 2001 when he became Engage's CEO and one of its directors. He served as an Engage director until August 2002 and its CEO until September 2002. Cuddy acknowledges that he received certain benefits from CMGI while in Engage's employ but denies that he had any other involvement with CMGI during his Engage employment. The Movants' Reply states that after approximately September 2002 Cuddy "no longer worked for or with Engage or CMGI and had no ongoing day-to day involvement or communications with those companies."

On June 19, 2003 (the "Petition Date") Engage, Inc. and five of its non-operating wholly-owned subsidiaries filed voluntary petitions pursuant to Chapter 11 of the United States Bankruptcy Code. The cases were jointly administered and ultimately substantively consolidated under the joint plan of liquidation. CMGI was scheduled as a creditor; the Movants were not scheduled as creditors nor were they listed on the creditor matrix. Potential claims against CMGI and the Movants were not listed as assets of any of the estates.

Shortly after the Petition Date the Court set September 15, 2003 (the "Bar Date") as the bar date for filing prepetition unsecured claims. The Notice of Bar Date was served on CMGI but not the Movants. The Notice of Bar Date was posted on the Internet website of The Trumbull Group, the Debtors' noticing and claims agent appointed in these cases.

On August 4, 2003, after the sale of substantially all of the Debtors' assets, the Court ordered the Debtors and Creditors' Committee to show cause why the case should not be converted. In their written response the Debtors refer to the role they expected to play with respect to the Creditors' Committee as "assist[ing] in review of prepetition insider transactions." The Debtors' response was served on counsel to CMGI who is now also counsel to Wetherall, McMillan, and Hajducky, and on counsel to Scene7, Inc.,[1] who is now also Cuddy's counsel. In the Committee's response it stated:

> Among the factors mitigating in favor of retaining the case in Chapter 11 are the Debtors' projections of higher receivables collections and a higher dividend to unsecured creditors in Chapter 11, *and the rapidly approaching deadline to assert claims against CMGI, Inc. Further, with respect to the assertion of any claims against the Debtors' current or former officers and directors, having those claims asserted by the Committee as opposed to a Chapter 7 Trustee may put the estate in a better position insofar as coverage exclusions in the Debtors' D & O policy are concerned.*

(Emphasis added). The Creditors' Committee response was also served on the attorneys for CMGI and for Scene7, Inc.

On September 24, 2003 the Creditors' Committee, as the estate representative, filed an adversary proceeding (03–4285) against CMGI in connection with the September Transaction. The Movants are expressly mentioned by name in the original complaint. For example, paragraph 10 provides, in part, that "[r]epresentatives of CMGI historically populated Engage's

---

1. Scene7, Inc. was the stalking horse bidder for the sale of substantially all of the Debtors'

assets. It was not the successful purchaser.

board of directors." The same paragraph then lists each of the Movants along with the dates each is alleged to have rendered services to CMGI, Engage, or both. Paragraphs 11 and 12 further allege that CMGI exercised control over Engage by CMGI's attendance at and participation in Engage board meetings and "Engage's confidential management meetings." In essence the complaint and the subsequently amended complaint charge that CMGI forced Engage to act in CMGI's best interest. The complaints also allege that when the non-CMGI directors formed a "Special Committee" to evaluate Engage's rights under a certain agreement, they did so over the objections of Wetherall and McMillan. In fact, in the complaint the Committee alleges that McMillan "admonished the first special committee for seeking to proceed independently of CMGI...." Moreover the complaint alleges that Cuddy, who participated in weekly confidential management meetings, leaked confidential information to CMGI. On April 6, 2004 the Committee served a deposition subpoena on Cuddy in this adversary proceeding.

On February 4, 2004 the Debtors filed their first disclosure statement. Although it discussed the CMGI adversary proceeding in the body of the disclosure statement, it did not address any potential causes of action against the Movants. The plan, filed with that disclosure statement, defines "D & O Claims" as including claims "against former officers and directors of the Debtors." On March 30, 2004 the Court approved the adequacy of the disclosure statement as it was to be amended in accordance with representations and rulings at the hearing. The Debtors filed two amended disclosure statements on March 31, 2004: one in support of the First Amended Plan; the other in support of the Second Amended Plan-the plan that was ultimately confirmed.

Both amended disclosure statements contain the following language:

As discussed further in this Disclosure Statement, the Committee has commenced a lawsuit against CMGI, concerning, among other things, the September Transaction. As further discussed below, the Committee is also investigating a potential Avoidance Action against Navisite, Inc., a former affiliate of Engage, and potential claims against current and/or former Engage and/or CMGI officers and directors, including in connection with the September transaction [sic].

Pursuant to the Second Amended Plan "Causes of Action," including "D & O Claims," which, as in the earlier plans, was defined to include claims against the Debtors' current or former officers or directors, were to be transferred to the Creditors Trust administered by the Liquidating Supervisor. The Movants, individually, were not served with a copy of the Debtors' plan or disclosure statement. These documents were served on CMGI and were posted on the Trumbull website.

On May 7, 2004 the Committee filed a motion expressly requesting standing to sue the Debtor's former officers and directors on behalf of the estate. On the same day, and served in the same mailing, was a stipulation extending the time by which Cuddy and certain other former officers of Engage had to object to confirmation. The Stipulation lists Attorneys John Lochnane and Alex Mattera of the law firm of Gadsby Hannah LLP as counsel to Cuddy; the stipulation was signed on Cuddy's behalf by the Debtor's counsel with Attorney Mattera's permission. By early May, at the latest, Cuddy had actual knowledge that he was likely to be sued. CMGI's counsel was also served with a copy of the Committee's motion for standing which the Court scheduled for hearing.

On May 11, 2004 the Debtor's counsel gave notice of that hearing by mail and by telecopier to Attorney Lochnane, Cuddy's counsel, and to Attorneys Swaim and Daley at Hale and Dorr, CMGI's counsel.

On May 28, 2004 the Committee[2] commenced an adversary proceeding (04–4352) against the Movants alleging, among other things, breach of their fiduciary duty to Engage. This adversary proceeding has been consolidated with the one pending against CMGI.

In July 2004 each of the Movants filed a proof of claim seeking indemnification of alleged administrative expenses[3] from the Debtors. Each of the proofs of claim, except the one filed by Cuddy, directs notices to be sent to the claimants in care of CMGI. Approximately one month later the Movants filed the motions seeking authority to file these same claims as prepetition claims. The Liquidating Supervisor objected because, among other things, the Movants failed to proffer any affidavits asserting facts necessary to prove excusable neglect. The Movants filed their joint reply without any affidavits or verifications. The Court issued a notice of a nonevidentiary hearing. Although Cuddy was present at the hearing, counsel did not call him to testify but simply stated that Cuddy was present in the event that the Court had questions. The Court is not aware that any of the other Movants were present.

Following the hearing, the Court took the matter under advisement and subsequently issued a Notice asking the parties to inform the Court whether they wished the Court to conduct an evidentiary hearing. All of the Movants responded that an evidentiary hearing was not necessary as the record before the Court was sufficient. All of the Movants would participate in an evidentiary hearing if the Court deemed one "useful or necessary." In the event the Court wanted an evidentiary hearing, Wetherall, Hajducky, and McMillan proposed an evidentiary schedule that, for the first time, would involve their submitting affidavits. The Liquidating Supervisor responded that an evidentiary hearing was not necessary and reiterated his position that the Movants did not carry their burden.

## POSITION OF THE PARTIES

Wetherall, McMillan, and Hajducky assert that they should be allowed to file their claims late because their failure to file timely proofs of claim was the result of "excusable neglect." They state that they were not personally served with the Notice of Bar Date, a fact not disputed by the Liquidating Supervisor. Moreover they allege that they had no reason to believe that they would be the subject of a lawsuit for actions taken in their capacities with Engage. What they do not state is that they were unaware of Engage's bankruptcy and the Bar Date although, at oral argument, their counsel argued they had "no separate knowledge" of the Bar Date. They also do not address their knowledge of the CMGI litigation or what they knew about the plan and disclosure statement in their various iterations.

In addition to the above arguments, Cuddy argues that failure to allow him to file a late claim violates his due process rights. Moreover his attorney argues that Cuddy had no connection with either En-

---

**2.** The Trustees of the Engage Creditor Trustee have been substituted as the Plaintiffs.

**3.** The confirmation order set July 9, 2004 as the bar date for administrative expenses incurred after the post-petition sale of virtually all of the Debtors' assets. The claims, if they are administrative claims, are timely filed. The Liquidating Supervisor, however, has objected to the Administrative Claims.

gage or CMGI for almost one year prior to the bankruptcy.

The Liquidating Supervisor alleges that the Motions should be denied because none of the Movants offered any evidence to support their allegations. No affidavits were submitted with the Motions or the Reply and, although Cuddy was present in Court, the matter was scheduled as a non-evidentiary hearing and no testimony was taken. In his response to the Court's Notice, the Liquidating Supervisor argues that although the Movants were not entitled to an evidentiary hearing after they failed to carry their burden at the first hearing, they "now have eschewed yet another opportunity ... to develop an evidentiary record." The Liquidating Supervisor disputes the factual allegations, primarily those of Wetherall, McMillan, and Hajducky, and asserts that they were aware of both the Bar Date and the possibility that each would be sued in connection with the September Transaction. The Liquidating Supervisor points to the discussions that he believes predecessor counsel[4] had with CMGI when the cash collateral order was being negotiated.

The Liquidating Supervisor argues that Cuddy had knowledge of the plan and disclosure statement; Cuddy objected to confirmation[5] although he acknowledges that, at the confirmation hearing, the Debtors claimed Cuddy was not a party in interest.

## DISCUSSION

### Excusable Neglect

 "[W]hen an act is required or allowed to be done at or within a specified period by the rules or by a notice given thereunder or by order of court, the court for cause shown may at anytime in it discretion ... (2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect." Fed. R. Bankr.P. 9006(b)(1, 2). The Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates, Ltd.*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), addressed the question of what constitutes excusable neglect and concluded that "Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Id.*, 507 U.S. at 388, 113 S.Ct. at 1495. This language has been widely and correctly held to have fashioned a two-step test to determine whether excusable neglect exists. The first step is a determination of whether "neglect" exists. "The ordinary meaning of 'neglect' is 'to give little attention or respect' to a matter, or, closer to the point for our purposes, 'to leave undone or unattended to esp[ecially] through carelessness.' Webster's Ninth New Collegiate Dictionary 791 (1983) (emphasis added)." *Id.* The determination of whether the neglect is "excusable", the second prong of the test, "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include ... the danger of prejudice to the [non-movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reason-

---

4. Counsel to the Liquidating Supervisor was the successor counsel to the Creditors' Committee. The Committee's first counsel, who had discussed that his firm also represented CMGI in unrelated transactions, withdrew in August 2003.

5. Cuddy objected to the proposed tax treatment because of his concern that he might be deemed a "responsible person" liable for unpaid taxes.

able control of the movant, and whether movant acted in good faith." *Id.*, 507 U.S. at 395, 113 S.Ct. at 1498.

■ "A creditor seeking to extend a deadline based upon excusable neglect bears the burden of proving excusable neglect by a preponderance of the evidence. *See In re Bulic*, 997 F.2d 299, 302 (7th Cir.1993); *In re Houbigant, Inc.*, 188 B.R. 347, 354 (Bankr.S.D.N.Y.1995)." *In re Roasters Corp.*, 2000 WL 33673776, *4 (Bankr.M.D.N.C.). A "preponderance of the evidence" means an amount of evidence that is enough to persuade the trier of fact that a fact in contention is more likely true than not true. *In re Braniff, Inc.*, 1992 WL 469799, *2 (Bankr. M.D.Fla.).

### Contested Matters

There can be no dispute that the matter before the Court is a contested matter governed by Fed. R. Bank. P. 9014. Rule 9014(d) requires that "[t]estimony of witnesses with respect to disputed material factual issues shall be taken in the same manner as testimony in an adversary proceeding." Fed. R. Bankr.P. 9014. Subdivision (d) was "added to clarify that if the motion cannot be decided without resolving a disputed material issue of fact, an evidentiary hearing must be held at which testimony of witnesses is taken in the same manner as testimony is taken in an adversary proceeding or at a trial in a district court civil case." The Court, however, need not force the Movants to hold an evidentiary hearing. Indeed the Court has given the Movants meaningful opportunities to develop the record in order to carry their burden. *In re Maloni*, 282 B.R. 727, 732 (1st Cir. BAP 2002). *See also In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 312 (Bankr.S.D.N.Y.2001). They have declined. Thus the motions will suc-

ceed or fail based on the record before this Court.

### Wetherall, McMillan, and Hajducky

■ These three Movants do not allege that their rights to due process have been violated, only that they should be permitted to file late claims because of their "excusable neglect." Thus, in order to prevail, they must demonstrate that they were both negligent and that such negligence was excusable. They do not assert, much less offer testimony by way of affidavits or otherwise, that they lacked actual knowledge of the bankruptcies or even the Bar Date, however. Instead they assert that they were not "personally served" with the Notice of Bar Date. If, however, they had actual knowledge of the Bar Date, that they were not personally served is irrelevant. That McMillan, as CEO of CMGI, was unaware of Engage's bankruptcy and his potential exposure when CMGI was being sued in a complaint that expressly mentions him and his alleged actions, is not credible. That Wetherall as the "non-executive chairman of the CMGI board" also was caught unawares defies any reasonable belief. As members of CMGI's board the only reasonable inferences to be draw are that they were well informed about the Engage bankruptcy and that by September 2004 when CMGI was sued, they were aware of the complaint and its allegations, including those that expressly implicated them in CMGI's alleged control over Engage. Moreover, that each of these Movants has now requested that notices be sent to them in care of CMGI and that each are represented by the same counsel representing CMGI is telling.

Similarly they complain that they did not know of the potential litigation against them and thus they did not know they had claims. Yet each had indemnification rights by law and with respect to McMillan

and Wetherall, by contract as well. These rights, coupled with the Bankruptcy Code's definition of "claim," namely that it includes a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed...," 11 U.S.C. § 101(5)(A), leads to the inevitable conclusion that each held a contingent, unliquidated claim for indemnification well before they were actually sued. *Cf. In re Highland Group, Inc.*, 136 B.R. 475, 481 (Bankr.N.D.Ohio 1992) ("Where an indemnification agreement is entered into prior to a bankruptcy filing, such an execution gives the indemnitee a contingent prepetition claim."). Furthermore, that claims would likely be brought against them was addressed in the plan and disclosure statement from at least as early as February 2004. In addition a reading of the complaint against CMGI implicates them in the behavior complained of therein. None of these individuals address the scope of their relationship with CMGI, a party served with all pleadings in these cases, or the fact that they and CMGI have the same counsel except for such cageyly-crafted statements as McMillan, despite being the CEO of CMGI, "did not have *principal* authority to review litigation;" that Wetherall as the Chairman of CMGI's board attended *"periodic* board meetings but was not responsible for the *day-to-day management and affairs* of the company;" or that Hajducky "did not have any *day-to-day involvement or communication* with CMGI or Engage" after his resignation in "approximately 2001;" (Emphasis added). That none of them ran the day-to-day operations of CMGI misses the point. This litigation is hardly something that reasonably can be characterized as a routine matter and given that the actions of all of them are central to most, if not all, of the allegations in the complaint against CMGI and the positions still held by Wetherall and McMillan at CMGI, it defies common sense to infer that they never had discussions about their potential personal liabilities. Despite the many chances they have been given to present evidence, they have remained conspicuously silent.

Simply put, casting the facts known to the Court in the best possible light for these Movants, it is just as reasonable for the Court to infer that these parties had actual knowledge of the Bar Date and their potential exposure to be sued as to conclude that they did not. That they did not come forward sooner could just as easily been part of a deliberate "wait and see" strategy and not the result of lack of knowledge. For this reason the Movants have failed to carry their burden to prove excusable neglect by a preponderance of the evidence.

*Cuddy*

 Cuddy, through his counsel, represents that he had no relationship with either Engage or CMGI since September 2002, a representation not challenged by the Liquidating Supervisor. What Cuddy does not expressly mention is that one of his last acts on the way out of Engage's door was to give Wetherall and McMillan explicit indemnity agreements, a move that suggests the former officers and directors were concerned that an independent observer might conclude something was amiss with the September Transaction. He does not address the fact that he was subpoened by the Committee in connection with the Adversary Proceeding brought against CMGI in which he figures prominently. Cuddy clearly had knowledge of the bankruptcy as well as the plan and disclosure statement. He objected to confirmation. He was, at least from May 7, 2004 forward, represented by his current counsel who had actual knowledge of the Committee's request to be given standing to sue Cuddy and the other Movants. Al-

though he complains that he has been denied his right to due process, he also failed to avail himself of the chance to testify, by affidavit or in person, that he lacked the requisite notice, a position contradicted by the facts know to the Court and the reasonable inferences to be draw from them. Again, given the role he played according to the complaint against CMGI, the Court finds it highly unlikely that he did not have any conversations with anyone at CMGI about the litigation against CMGI and his own potential exposure. His silence on these points, like that of his fellow Movants, speaks volumes, and he, like they, has failed to meet his burden to establish excusable neglect by a preponderance of the evidence.

## CONCLUSION

For the foregoing reasons, the Motion of Wetherall, McMillan, and Hajducky is DENIED. The Motion of Cuddy is DENIED.